JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email: bulgozdyj@sec.gov
MANUEL VAZQUEZ (Cal. Bar No. 295576)
Email: vazquezm@sec.gov
MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
Email: montgomerym@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Dabney O'Riordan, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| BIC REAL ESTATE DEVELOPMENT CORPORATION and DANIEL R. NASE, individually and d/b/a BAKERSFIELD INVESTMENT CLUB, | |
| Defendants, | |
| BIC SOLO 401K TRUST and MARGARITA NASE, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§

COMPLAINT

1   77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the

2   Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

3   78u(d)(3)(A), 78u(e) & 78aa(a).

4       2.   Defendants have, directly or indirectly, made use of the means or

5   instrumentalities of interstate commerce, of the mails, or of the facilities of a national

6   securities exchange in connection with the transactions, acts, practices and courses of

7   business alleged in this complaint.

8       3.   Venue is proper in this district pursuant to Section 22(a) of the Securities

9   Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a)

10  because certain of the transactions, acts, practices and courses of conduct constituting

11  violations of the federal securities laws occurred within this district.  In addition,

12  venue is proper in this district because Defendant Daniel R. Nase resides in this

13  district, and Defendant BIC Real Estate Development Corporation has its offices in

14  this district.

### SUMMARY

15

16      4.   Daniel R. Nase and the corporation he controls, BIC Real Estate

17  Development Corporation ("BIC"), engaged and are engaging in an unregistered and

18  fraudulent offer and sale of BIC securities.  From July 2013 through September 2015,

19  BIC and Nase raised at least $11.6 million from approximately 400 investors

20  nationwide to purchase BIC common stock.  While Nase and BIC stated that the

21  purpose of the offering was to provide funds for BIC to purchase real property in

22  Bakersfield, California, and fractional interests in promissory notes for consumer

23  loans, in fact, the offering was simply a scheme by Nase and BIC to defraud investors

24  for his personal benefit.

25      5.   As part of his fraud, Nase misappropriated approximately $5.5 million of

26  BIC assets by using investor funds to purchase real properties that he then titled and

27  held in his own name or the name of his wife, Relief Defendant Margarita Nase, or in

28  the name of their trust, Relief Defendant BIC Solo 401k Trust.  He also transferred

1   cash from BIC's account to his personal account at LendingClub.com, and used

2   BIC's funds to pay his personal expenses even as BIC paid Nase and his wife

3   generous salaries.

4         6.      After the SEC subpoenaed Nase for investigative testimony in May

5   2015, Nase misappropriated more assets, and Nase tried to cover up the fraudulent

6   activity by using the stolen assets to falsely inflate Nase's equity interest in BIC at the

7   expense of the investors.  Nase misappropriated over $3.7 million of investor funds to

8   acquire an oil company in the name of the BIC Solo 401k Trust.  Nase then

9   transferred the oil company to BIC, but in a "Member Ledger" he created for BIC,

10  Nase gave himself a net credit in the equity ownership of BIC for the transfer.  Nase

11  also transferred most of the previously misappropriated real properties titled in his

12  and/or his wife's names to BIC, but in the "Member Ledger" which purports to show

13  Nase's capital account at BIC, Nase gave himself credit for his proportionate

14  "ownership" share of the properties' rent and appreciation in value.  In total, Nase

15  credited himself with net equity contributions to BIC of over $6 million for these

16  transfers, and inflated his equity stake in BIC from a stock value of $100,000 at the

17  time the company was formed in 2013 to over $6.29 million as of February 2016.  In

18  fact, Nase's claimed equity contributions came from assets—the properties and the

19  oil company—that had been acquired with investor money.  Nase himself invested

20  less than $425,000 of his own money in BIC.

21        7.      More recently, Nase and BIC are purportedly liquidating BIC until the

22  "government stuff" is resolved.  Nase and BIC proposed a "liquidation plan" to

23  repurchase BIC shares from investors, in return for interests in the real property now

24  in BIC's name.  The plan also contemplates future payments to the extent a

25  shareholder has an unpaid "original member obligation" – that is, they have not

26  received their entire original investment.  The largest single beneficiary of the

27  liquidation plan is Nase.  Nase and BIC propose to transfer to Nase personally the oil

28  company acquired with investor funds, a solar company capitalized with investor

funds, and a property management company that manages BIC's real properties.  In addition, Nase has at least $480,000 of investor funds on deposit in his personal account with LendingClub.com, which is not mentioned in the "liquidation plan."

8.     BIC and Nase have also made several materially misleading representations and omissions to investors about the use of investor funds, the assets owned by BIC, and Nase's investments in BIC.

9.     BIC Solo 401k Trust has been unjustly enriched by its receipt of investor funds and properties purchased with investor funds, to which BIC Solo 401k Trust has no legitimate claim.  Similarly, Margarita Nase has received over $1 million of BIC stock to which she has no legitimate claim.

10.     The SEC requests that the Court find that BIC and Nase violated Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  The SEC requests that the Court issue temporary, preliminary, and permanent injunctions against the illegal conduct, freeze the assets of the Defendants and Relief Defendants, order the Defendants and Relief Defendants to provide an accounting, appoint a receiver to take control of BIC and its subsidiaries, order the Defendants and Relief Defendants to disgorge their ill-gotten gains with prejudgment interest, and impose civil penalties on Nase and BIC for their illegal conduct.

## DEFENDANTS

11.     **BIC Real Estate Development Corporation ("BIC")** is a California corporation formed on or about July 19, 2013, with its principal place of business in Bakersfield, California.  BIC purchases and owns real property.  BIC owns the following subsidiaries:  Tier 1 Solar Power Company, LLC ("Tier 1 LLC"); Tier 1 Solar Power Company ("Tier 1 Co."); WM Petroleum ("WM Petroleum"); Target Oil & Gas Drilling, Inc. ("Target Oil"); and Home Sweet Holdings ("Home Sweet Holdings").  BIC is not registered with the SEC in any capacity.

12.     **Daniel R. Nase ("Nase")**, individually and d/b/a Bakersfield Investment

Club, is a resident of Bakersfield, California.  Nase is a director, chief executive officer, president, and "Managing Shareholder" of BIC.  Nase also organized and operated the Bakersfield Investment Club, which maintained a website at www.bakersfieldinvestmentclub.com.  Nase is a director and treasurer of Target Oil, and a director of WM Petroleum.  Nase is not registered with the SEC in any capacity.

## RELIEF DEFENDANTS

13.   **Margarita Nase ("Margarita Nase"),** resides in Bakersfield, California.  Margarita Nase is a director and the chief operating officer of BIC, and a director and secretary of WM Petroleum and Target Oil.  Through her d/b/a Property Management of Bakersfield, Margarita Nase manages properties purchased by BIC, including collecting rents.

14.   **BIC Solo 401k Trust** is a California trust organized effective January 1, 2014.  Nase and Margarita Nase are its trustees.  The sole beneficiary is Margarita Nase's child, who is also the step-son of Nase.

## RELATED ENTITIES

15.   **Tier 1 Co.** is a California corporation formed on November 3, 2014, with its principal place of business in Bakersfield, California, and is a subsidiary of BIC.  Nase is the signatory on its bank account and lists himself as the "owner with control of entity."

16.   **Tier 1 LLC** is a Delaware limited liability company formed on March 18, 2015 with its principal place of business in Bakersfield, California, and is a subsidiary of BIC.  Nase is the signatory on its bank account and lists himself as the "sole owner."

17.   **WM Petroleum** is a California corporation formed on May 15, 2014, and uses Nase's home address as its business address.  WM Petroleum is currently a subsidiary of BIC.  WM Petroleum owns Target Oil.  WM Petroleum was wholly-owned by BIC Solo 401k Trust at the time it purchased Target Oil.

18.     **Target Oil** is a California corporation formed on June 4, 1992.  It was purchased by WM Petroleum in June 2015.  Nase is a director and treasurer of Target Oil.

19.     **Home Sweet Holdings** is a California corporation formed on September 17, 2015 with its principal place of business in Bakersfield, California, and is a subsidiary of BIC.  Home Sweet Holdings was formed to manage properties purchased with BIC funds.

## ALLEGATIONS

I.      **BIC and Nase Engaged in an Unregistered Offer and Sale of BIC Securities**

A.      **Nase controls BIC**

20.     According to BIC's materials, it is in the business of buying real estate located primarily in Bakersfield, California, for the purpose of renting or flipping the properties for a profit.  In addition, BIC purchases fractional interests in consumer loans through LendingClub.com.

21.     Nase controls all aspects of BIC's operations as its CEO, president, and "Managing Shareholder."  Nase decides which properties to purchase or sell, and manages all day-to-day operations of BIC.

22.     Nase maintains BIC's books and records, and generates financial statements such as balance sheets and profit and loss statements.  Nase also reviews and edits BIC's financial statements, which at one time were posted on the Bakersfield Investment Club website that Nase controls.

23.     Nase and Margarita Nase were the signatories on BIC's bank accounts.

B.      **Defendants' unregistered offer and sale of BIC securities**

24.     Between July 2013 and September 2015, BIC and Nase raised at least $11.6 million from the offer and sale of BIC securities in interstate commerce to at least 400 investors.  While many purchasers of BIC stock reside in Bakersfield, Nase and BIC also offered and sold BIC stock to residents of other states.

25.     BIC and Nase solicited investors through the "Bakersfield Investment Club," and similar purported investment clubs, which used investor funds solely to purchase BIC stock.

26.     In 2013, Nase purchased the website domain www.bakersfield investment club.com ("BIC Website"). Nase and others working with him created and developed content for the BIC Website. The BIC Website played a video, narrated by Nase and which displayed a PowerPoint presentation, which provided information on Nase's background and experience, and explained how investor funds flowed from Bakersfield Investment Club to BIC. The video and PowerPoint explained how BIC purportedly used investor funds to "buy houses and notes and pays out dividend for the income."

27.     The BIC Website was not password protected and was generally available to the public at large.

28.     Potential investors were referred to the BIC Website and video as a source of information concerning BIC.

29.     Nase also conducted regular monthly meetings of the Bakersfield Investment Club at BIC's offices in Bakersfield, which were open to existing investors and potential investors. So-called "managers" of affiliated investment clubs also attended the meetings. At the meetings, Nase or the "managers" told investors that BIC's investment strategy was to invest in real estate and notes.

30.     The "managers" of affiliated investment clubs earned referral fees and compensation for finding and referring investors to Nase and BIC.

31.     Nase supervised BIC's social media presence on sites such as Facebook and YouTube, where videos of the meetings of the Bakersfield Investment Club were posted.

32.     Nase and BIC also participated in trade shows and investment conferences where they passed out investment materials to prospective BIC investors, such as a trade show in Dallas, Texas.

33.    When individuals expressed interest in joining an investment club and investing in BIC through an IRA or as a club manager, Nase and BIC instantly named them as "directors" of BIC.  According to Nase, this immediately qualified an individual as an "accredited investor" under SEC regulations.

34.    Prospective investors were provided with a packet of offering materials that varied over time, but each prospective investor received a document titled "Investment Club Agreement," a document titled "Shareholder Agreement," and a "Confidential Private Placement Memorandum" for BIC ("BIC PPM").  The offering materials show that the investment clubs were simply a means to offer and sell BIC securities.

35.    Investor funds received by Nase were deposited into BIC's bank accounts or accounts held in the name of Bakersfield Investment Club, which Nase controlled as the signatory.  Investor funds were received primarily in the form of personal or cashier's checks.

36.    Nase purportedly maintained a "Member Ledger" for each investor, including himself, that purported to keep track of each investor's capital contributions and withdrawals from BIC.  Nase then adjusts the number of shares an investor owns in BIC, using a fixed stock price of $10 per share, based on the dollar balance that appears the Member Ledger.

37.    At all relevant times, no registration statement has been filed with the SEC or has been in effect for BIC's securities or the offering of those securities by BIC and Nase.

### i.    Investment Club Agreement

38.    The Investment Club Agreement for the Bakersfield Investment Club states that funds received from investors "will be used to purchase notes, stock or real estate according to the Investment Club's current investment strategy voted upon by the Club Members and approved by the Fund Manager."  The agreements for affiliated investment clubs mirror the agreement of the Bakersfield  Investment Club.

COMPLAINT                                    7

39.     The Investment Club Agreement identifies Nase as the "Fund Manager," and instructs investors to send payments by mail to BIC's address or give them "in person to Daniel Nase, the Fund Manager, or your local Club Manager."

40.     After the signature line for the investor, the Investment Club Agreement acknowledges that investor funds are going to be invested in BIC: "Please keep in mind that private stock is available to the investment club in $10 increments and you acknowledge receiving a copy of the Private Placement Memorandum and a Shareholder's Agreement."

41.     In that same paragraph, the Investment Club Agreement confirms that investors were buying BIC stock: "In order to comply with SEC rules, each Shareholder is also a Director of BIC Real Estate Development Corporation, and we vote once per year on the Current strategy to ensure active participation."

## ii.     BIC PPM

42.     Nase drafted the BIC PPM based on a template he obtained from the website Legalzoom.com.

43.     The BIC PPM is a ten-page document dated August 1, 2013.  The BIC PPM states that BIC was offering up to 100,000,000 shares of common stock at $10 per share, with a minimum offering of 10,000 shares and a maximum offering of 49,000,000 shares.  The "minimum purchase per investor" was one share.  The BIC PPM states that BIC was "initially capitalized by an investment of $100,000.00 of which a sum of $100,000.00 is from Daniel Nase."

44.     The BIC PPM discloses that the "company strategy is to:  Buy notes, flip properties, buy and rent, buy tracts of land, build and sell properties, build and rent properties.  Transition assets from real estate to notes at the top 80-95% of the next bubble and then transition assets from notes to real estate at the bottom of the next bubble."

45.     The BIC PPM includes a section titled "Management" that lists "each director, principal director, and other control person."  The BIC PMM identifies Nase

as "President/CEO" and Margarita Nase as "Corporate Secretary."

46.     The BIC PPM also advises prospective investors that any additional information may be requested from Nase.

### iii.     Shareholder Agreement

47.     Nase drafted the Shareholder Agreement using a template he obtained from the website Legalzoom.com.

48.     The Shareholder Agreement is between the investor and BIC.  The Shareholder Agreement confirms that individuals joining the investment clubs were being offered and sold shares of BIC. The Shareholder Agreement uses the term "the C Corporation" to refer to BIC.

49.     While the Shareholder Agreement states that the board of directors of BIC consists of all shareholders, it appoints Nase as the "Managing Shareholder" to "manage, control, and operate the business and affairs of the C Corporation as President and General Manager without any further action or approval by the Shareholders or the Board."

50.     The Shareholder Agreement also provides that there "shall be no regular meetings of Shareholders of the C Corporation" and further states that the "Managing Shareholder is appointed as the proxy of the individual shareholders."

51.     The Shareholder Agreement is designed to give complete control of BIC to Nase, even though each investor is designated as a member of the Board of Directors of BIC.

## II.     The Scheme to Defraud

52.     Nase and BIC have engaged, and continue to engage, in a scheme to defraud investors by misappropriating investor funds and BIC corporate assets for the personal benefit of Nase and his family.  Nase and BIC recently tried to cover-up their misconduct with a fraudulent offer to repurchase BIC common stock from investors.

53.     The fraudulent scheme perpetrated by Nase and BIC has evolved over

time.  Initially, Nase simply misappropriated investor funds for his own benefit in different ways.  Nase used investor funds to purchase real property, but then titled the properties, in whole or in part, in his name, his wife's name, or the name of their trust, Relief Defendant BIC Solo 401k Trust, thus misappropriating the BIC investors' assets.  Nase and BIC provided financial statements for investors that listed the properties as assets of BIC.  In addition, Nase misappropriated approximately $484,000, net, of investor funds and deposited them into his personal LendingClub.com account.  Nase also misappropriated at least $84,000 of investor funds to pay his personal expenses despite paying himself and his wife a generous salary.

54.     Defendants' fraudulent scheme then changed after the SEC subpoenaed Nase to testify in its investigation in May 2015.  Nase transferred title to many of the misappropriated properties to BIC, but gave himself credit for contributing capital to BIC in the amount of over $1 million because of the transfer of the misappropriated assets.  Nase also misappropriated over $3 million of investor funds, and then used the money to fund the BIC Solo 401k Trust's purchase of Target Oil.  Nase then transferred the oil company to BIC, and gave himself a net credit of about $2.75 million for contributing capital to BIC.  Through his entries on his "Member Ledger" and the transfer of misappropriated assets to BIC, Nase increased his claimed ownership of BIC from 10,000 shares (representing a $100,000 investment) to over 629,000 shares (representing a $6.29 million investment).  In fact, Nase is simply seeking to cover up his misappropriation of BIC's cash and assets by converting them into a misappropriation of equity in BIC.

55.     More recently, in early 2016, in an effort to shelter assets from the reach of regulators and the courts, Nase and BIC started using a "liquidation plan" to distribute real estate to investors, at least temporarily, to cash out their ownership of BIC stock.  The "liquidation plan" is based on Nase's fraudulently overstated ownership of about 36% of the company stock, and thus shortchanges investors of

1   their fair share of BIC's assets.  The "liquidation plan" purports to confirm Nase's

2   misappropriation of investors' assets by transferring ownership of substantial

3   company assets to Nase, including the oil company, a solar company, and a property

4   management company.

5        56.    At all relevant times during the scheme to defraud, Nase acted with

6   scienter.  Among other things, Nase controlled all the funds, bank accounts, and

7   transactions, and determined how to title property and move funds.  Nase credited his

8   Member Ledger account with misappropriated assets at the expense of BIC investors

9   as a means of furthering his fraudulent scheme.  Nase acted for his own self-interest

10  and enrichment, to the detriment of investors.

11       57.    In addition, Nase acted negligently in connection with his fraudulent

12  acts.

13       58.    As a director, CEO, and president of BIC, Nase's scienter is imputed to

14  BIC.

15       59.    Nase and BIC used means and instrumentalities of interstate commerce

16  to perpetrate their fraud, including the Internet, email, U.S. Mail, the telephone, and

17  bank and wire transfers.

18                    **A.    Nase misappropriated investor funds to buy properties he**

19                    **titled as his own, in whole or in part**

20       60.    Beginning no later than August 2013, Nase misappropriated investor

21  funds to purchase property that was then titled, in whole or in part, in the name of

22  Nase, Margarita Nase, and/or the BIC Solo 401k Trust.

23       61.    Through this scheme, Nase misappropriated ownership of all or part of

24  at least 55 properties, and the value of the properties Nase misappropriated through

25  this particular scheme totals approximately $4.9 million.

26       62.    Between August 2013 and May 2015, approximately 59 properties were

27  purchased.  Fifty-six of those properties were purchased using over $6.3 million of

28  investor funds, but only one of the 56 properties was titled as owned 100% by BIC.

1  Nase misappropriated, in whole or in part, the ownership of at least 55 real properties
2  purchased with BIC investor funds.

3    63.    At least nine properties purchased using investor funds were titled as
4  owned 100% by Nase and Margarita Nase.  The amount of investor funds used to
5  purchase these properties was approximately $943,000.

6    64.    At least seven properties purchased using investor funds were titled as
7  owned 100% by BIC Solo 401k Trust.  The amount of investor funds used to
8  purchase these properties was approximately $1.141 million.

9    65.    About 39 properties purchased using investor funds were titled as
10  majority-owned by Nase and Margarita Nase, and minority-owned by BIC.  Most of
11  the properties were titled as 70% owned by Nase and his wife, and 30% owned by
12  BIC.  The corresponding dollar amount of the ownership percentage taken by Nase
13  and his wife in these 39 properties was approximately $2.85 million.

14    66.    Nase and BIC provided financial statements and property lists to
15  investors that identified these properties as belonging entirely to BIC.

16    **B.    Nase used misappropriated assets to misappropriate BIC**
17       **stock**

18    67.    Upon the formation of BIC, Nase allocated to himself 10,000 shares of
19  BIC common stock, which at $10 a share represented an initial investment of
20  $100,000.

21    68.    In connection with its investigation, the SEC issued a subpoena to Nase
22  on or about April 15, 2015, for Nase to appear and provide investigative testimony on
23  May 20, 2015.

24    69.    In or about May 2015 and prior to May 20, 2015, Nase transferred to
25  BIC his majority ownership of all but three properties he had titled in whole or in part
26  in his name.  The properties were then 100% owned by BIC.

27    70.    Nase did not transfer the interests he held in the properties for free.  Nase
28  gave himself approximately $1 million in BIC equity for these transfers to BIC.

71.     Nase based his calculation of the $1 million increase in his BIC equity on the fiction that he owned the proportionate share of each property, even though investor funds had been used to purchase and maintain the properties.  Nase claimed for himself the proportional increase in value of the properties based on his purported ownership.  To determine the increase in value, Nase purported to use an appraised value determined by his then 20-year old stepson.

72.     In addition, Nase credited himself with another approximately $211,000 contribution of capital to BIC, based on the proportionate share of rents that BIC collected on the property interests that Nase had misappropriated.

73.     Also in or around May 2015, Nase transferred three more properties into the name of the BIC Solo 401k Trust.  Two of the properties had been titled 100% in the name of Nase and his wife, and the third had been held 30% by BIC and 70% by Nase and his wife.  These transfers increased to ten the number of properties purchased with investor funds that were titled as wholly-owned by the BIC Solo 401k Trust.

C.     **In June 2015, Nase misappropriated over $3.7 million to purchase an oil company, and then transferred the oil company to BIC as his own capital contribution**

74.     In June 2015, Nase misappropriated over $3.7 million of investor money to fund the WM Petroleum's purchase of Target Oil.

75.     At the time of the purchase, WM Petroleum was 100% owned by the BIC Solo 401k Trust.  The trust is controlled by Nase and his wife.

76.     In June 2015, Nase engaged in a series of transfers of funds from the BIC's bank account to BIC Solo 401k Trust's bank account.  In total, Nase transferred approximately $3.08 million in cash from BIC's bank account to BIC Solo 401k Trust's bank account.  Approximately $2,067,215 of the BIC funds transferred to the BIC Solo 401k Trust were obtained by taking out mortgages on approximately 27 properties that were owned by BIC.

77.     Nase also took out mortgages on or sold several of the properties that had been purchased with investor funds and titled in the name of the BIC Solo 401k Trust. This generated approximately $703,000 of cash that was deposited into the BIC Solo 401k Trust account.

78.     After depositing the cash in BIC Solo 401k Trust's bank account, Nase used approximately $3.75 million to fund a Stock Purchase and Sale Agreement by which WM Petroleum purchased 100% of the outstanding stock of Target Oil.

79.     At some point after Nase arranged the purchase of Target Oil by WM Petroleum and the BIC Solo 401k Trust, Nase transferred to BIC ownership of Target Oil and WM Petroleum.

80.     Although Target Oil had been purchased with funds misappropriated from BIC in the first instance, at the time of the transfer Nase credited himself with a net contribution of over $2.75 million to BIC in his "Member Ledger," which increased his ownership of BIC stock by a corresponding amount.

81.     Nase thus used an asset purchased with misappropriated funds to then misappropriate additional shares in BIC for his personal benefit.

82.     As alleged below, Nase and BIC have proposed a liquidation plan that transfers ownership of the oil company to Nase personally. In this way, Nase proposes to keep for himself an asset purchased with misappropriated investor funds.

### D.     Nase misappropriated BIC funds

83.     Nase has misappropriated BIC funds for his personal use.

84.     Between about July 2013 and April 2015, Nase misappropriated a net $480,000 by transferring BIC investor funds to his personal LendingClub.com account.

85.     Nase deposited a total of approximately $798,400 of investor funds into his personal LendingClub.com account, and withdrew approximately $313,000 to the bank account of Bakersfield Investment Club, which Nase controls.

86.     On at least two occasions, at the same time Nase transferred BIC

investor funds to his personal LendingClub.com account, he also transferred similar if not identical amounts of investor funds to BIC's LendingClub.com account.

87.   Upon information and belief, Nase's personal LendingClub.com account is currently tied to his personal bank account, which would allow Nase to transfer the funds held in LendingClub.com to his personal account.

88.   As of January 2016, Nase's personal LendingClub.com account had a value of in excess of $590,000.  The funds in that LendingClub.com account, and the profits thereon, belong to the investors and were misappropriated for the personal benefit of Nase.

89.   In addition, Nase paid little in the way of personal expenses from his personal bank account.  Instead, Nase lived off the funds in the BIC corporate account, which he used to pay student loans apparently owed by Margarita Nase, food expenses, and large American Express bills.  The American Express bills included clothing expenses, vacations, and other personal expenses.

90.   In this manner, Nase misappropriated at least $84,000 of investor funds to pay his personal expenses.

91.   Nase misappropriated investor funds to pay his personal expenses even though BIC paid Nase a salary of $80,000 per year, and BIC paid Margarita Nase a salary of $80,000 per year.

**E.    Nase and BIC are liquidating BIC in an effort to cover-up their fraud and enrich themselves**

92.   Beginning in or about January 2016, Nase and BIC devised a liquidation plan that will harm investors by improperly transferring ownership to Nase of BIC assets with a value in excess of $6 million, and which is based on Nase's fraudulently inflated investment in BIC.

93.   In February 2016, Nase and BIC sent investors the details of their proposal to liquidate BIC.  The proposed liquidation plan states that it will distribute BIC assets to investors on a pro rata share based on ownership of stock in BIC.  The

liquidation plan also contemplates ongoing payments and future distributions, apparently because investors will not receive a return of their original investment under the plan. The liquidation plan will distribute valuable BIC assets to Nase personally, including the oil company, the solar company, and the property management company. Nase values the assets he will receive at $6 million. The liquidation plan also requires investors broadly to ratify all past acts of Nase and BIC management, although there is no disclosure of the past acts. Specifically, there is no disclosure of Nase's misappropriation of assets as alleged above, and his dilution of the ownership interests of BIC investors.

94.     In a "Statement of Majority Consent" dated February 1, 2016, BIC and Nase state that the liquidation plan is based on BIC having total outstanding shares of 1,730,417 (representing "investments totaling $17,304,163.48"). The "Statement of Majority Consent" states that that Nase and Margarita Nase hold "investments totaling $6,299,525.96 (629,953)" in BIC. For the purposes of the liquidation plan, Nase and Margarita Nase claim to own about 36% of the outstanding shares of BIC.

95.     Nase and Margarita Nase did not invest over $6 million of their personal funds in BIC. Their actual cash investment of funds not associated with the fraudulent scheme is less than $425,000.

96.     In a "Written Consent of Directors" dated January 15, 2016, Nase sought ratification of all actions taken since formation of the BIC. Neither the "Written Consent of Directors," nor the "Statement of Majority Consent," disclosed the fraudulent transactions alleged above.

97.     Among other provisions, the liquidation plan proposes to distribute ownership of individual properties to investors on a "first come, first served basis." The liquidation plan also represents that a majority of the properties are encumbered by mortgages. In return for receiving interests in property, BIC shareholders surrender their ownership in BIC.

98.     The liquidation plan is an offer for the sale and purchase of securities.

99.   BIC and Nase have informed investors that the liquidation plan is an effort to minimize assets held by BIC in the event of a regulatory proceeding.

100.   In a document titled "Written Consent of Directors" sent in or about January 2016 to investors, Nase and BIC informed investors that there was an ongoing investigation by regulators, including the SEC, for potential violations of the securities laws, and that BIC therefore wanted to distribute all assets of BIC to shareholders "as soon as possible." Investors were also informed that Nase and Margarita Nase had already been "transferring some of the Corporation's real estate assets to current shareholders/members in exchange for their ownership interest in the Corporation and its affiliated entities."

101.   In a January 23, 2016 email to investors, Nase cautioned investors about the pending regulatory investigation, and stated, in part:

> At this point we have no idea whether the regulators will ask for a fine for advertising or a receivership. . . . However, if they do implement a fine or a receivership, this would be bad for everyone and we would prefer if you held onto assets to prevent any losses to you. You will continue to receive income for the assets and we can continue to manage them for you, the main difference is that you own them directly and the regulator problem should be solved from your point of view.

102.   In February 2016, Nase and BIC disclosed that valuable assets of BIC would be transferred to Nase personally as part of the liquidation plan. Nase is to receive ownership of WM Petroleum and Target Oil, although Target Oil would quitclaim its real estate assets to the remaining shareholders who would also get a 1/16 overriding royalty on all oil and gas. Nase would also be given ownership of Tier 1 Co. and Tier 1 LLC, but if the real estate and oil company royalty and acreage "is later determined to be insufficient to cover the original member obligation," then Tier 1 Co. will assign to each remaining shareholder some solar equipment. The liquidation plan transfers ownership of Home Sweet Holdings to Nase.

103.   The liquidation plan states that to the extent shareholders do not receive back their "original member obligation," future distributions will be made of cash or of assets of the companies transferred to Nase.  The liquidation plan outlines an ongoing offer and sale of BIC securities, with ongoing payments based on pro rata ownership interests.

104.   Because the liquidation plan is based upon fraudulently inflated investments of Nase and Margarita Nase, the plan will unfairly distribute the assets of BIC to investors.  The consideration provided by BIC in exchange for the surrender of BIC shares is understated.

105.   Any pro rata distributions based on the fraudulently inflated holdings of Nase and Margarita Nase, that have occurred or which will occur in the future, will misappropriate additional assets from investors to Nase.

106.   The proposed liquidation plan is currently being implemented, to the detriment of BIC investors.

## III.   Defendants' False and Misleading Statements in the Offer and Sale of BIC Securities

107.   In addition to their fraudulent scheme, Nase and BIC have made materially false and misleading statements and omissions to BIC investors, in interstate commerce.

108.   At all relevant times in making these misrepresentations and omissions, Nase acted with scienter.  Nase knew, or was reckless in not knowing, that the misrepresentations and omissions were false.  Nase's scienter is imputed to BIC.

109.   At all relevant times in making these misrepresentations and omissions, Nase acted negligently.

### A.   Misrepresentations and omissions concerning use of investor funds

110.   The offering materials provided by BIC and Nase represented that investors proceeds would be used to purchase notes and real estate, and Nase

confirmed this verbally during meetings with investors.

111.   The Investment Club Agreement stated that investor funds would be used to "purchase notes, stock, or real estate."

112.   The BIC PPM represents that the "Business Plan" of the company is to buy notes, flip properties, buy and rent, buy tracts of land, build and sell properties, build and rent properties."

113.   Neither the Investment Club Agreement nor the BIC PPM disclosed material information that Nase would misappropriate investor funds for his own benefit.  The BIC PPM and the Investment Club Agreement failed to disclose that millions of dollars of investor funds were to be diverted for the benefit and enrichment of Nase.

114.   Defendants used means and instrumentalities of interstate commerce to distribute the Investment Club Agreement and BIC PPM.

115.   These misrepresentations and omissions regarding the use of investor funds and their misappropriation were material, because information about the use and misappropriation of investor funds is valuable information for an investor.

116.   Nase and BIC knew, or were reckless or negligent in not knowing, that the statements concerning the use of investor funds were materially false and misleading, and omitted material information, because Nase was directly involved in misappropriating investor funds for his benefit.

**B.   Misrepresentations and omissions concerning BIC's assets**

117.   BIC and Nase posted financial statements on the BIC Website for the benefit of investors and prospective investors that listed properties purportedly owned by BIC.  By placing these statements on the BIC Website, Defendants placed them in interstate commerce.

118.   In fact, the majority-ownership of the listed properties was held in the name of Nase and his wife, or their BIC Solo 401k Trust, and not by BIC.  In some cases, 100% of the ownership of properties listed as BIC assets on its financial

statements was in fact held by Nase, directly or indirectly.

119.   When Nase transferred his interest in the title of these assets to BIC in May 2015, he claimed the benefit of majority ownership despite having listed them as assets of BIC in financial statements that he made available to investors.

120.   These misrepresentations and omissions regarding BIC assets were material, because information about ownership of a company's assets is fundamental information for an investor.

121.   BIC and Nase knew, or were reckless or negligent in not knowing, that their representations in the financial statements concerning properties owned by BIC were false and misleading, and omitted material information that Nase and his wife claimed majority ownership interests in the properties that were listed as BIC assets.

### C.   Misrepresentations and omissions concerning Nase's investment in BIC

122.   In connection with the proposed liquidation of BIC, Nase and BIC distributed to BIC shareholders for their approval a "Statement of Majority Consent" dated February 1, 2016.  The document recited that there were 1,730,417 issued and outstanding shares of BIC, representing investments totaling $17,304,163.48.

123.   In that disclosure to investors, Nase represented that he and his wife held "investments totaling $6,299,525.96 (629,953 shares)" in BIC.

124.   Nase purportedly derived that number from the "Member Ledger" he created that debited and credited his stock account based on many of the transactions alleged above, such as the credits he took for the oil company, proportional share of the appreciation of the properties, and proportional share of the rent.  Nase and BIC failed to disclose that the basis for his investments included contributions of assets he had previously misappropriated.

125.   These misrepresentations and omissions regarding Nase's investments in BIC investor proceeds were material, because the respective ownership of BIC's shares was the basis on which assets were being distributed.

126.   BIC and Nase knew, or were reckless or negligent in not knowing, that the statement to investors that he and his wife had investments totaling $6,299,525.96 was false and misleading, and omitted material information about the misappropriation of corporate assets that Nase used to inflate his purported contribution.

127.   Defendants used means and instrumentalities of interstate commerce to transmit these statements to investors, including email and the Internet.

**IV.    Relief Defendants Have No Legitimate Claim to Funds or Assets They Have Received**

128.   Relief Defendant BIC Solo 401k Trust received property and assets totaling several million dollars, which were misappropriated from BIC.

129.   BIC Solo 401k Trust has no legitimate claim to any of the assets or funds it received.

130.   Relief Defendant Margarita Nase received at least 104,918.267 shares of BIC stock, which at $10 a share represents $1,049,182.67.  These shares are the profits of the fraudulent scheme and misappropriation of investors' assets, to which Margarita Nase has no legitimate claim.

## FIRST CLAIM FOR RELIEF

**[Fraud in the Connection with the Purchase and Sale of Securities]**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5 Thereunder**

**(against Defendants BIC and Nase)**

131.   The SEC realleges and incorporates by reference paragraphs 1 through 127 above.

132.   The defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

1        (a)    employed devices, schemes, or artifices to defraud;

2        (b)    made untrue statements of a material fact or omitted to state a

3    material fact necessary in order to make the statements made, in the light of the

4    circumstances under which they were made, not misleading; or

5        (c)    engaged in acts, practices, or courses of business which operated or

6    would operate as a fraud or deceit upon other persons.

7        133.   By engaging in the conduct described above, the defendants violated,

8    and unless restrained and enjoined will continue to violate, Section 10(b) of the

9    Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c)

10   thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

11   **SECOND CLAIM FOR RELIEF**

12   **[Fraud in the Offer or Sale of Securities]**

13   **Violations of Section 17(a) of the Securities Act**

14   **(against Defendants BIC and Nase)**

15       134.   The SEC realleges and incorporates by reference paragraphs 1 through

16   127 above.

17       135.   The defendants, and each of them, by engaging in the conduct described

18   above, in the offer or sale of securities by the use of means or instruments of

19   transportation or communication in interstate commerce or by use of the mails

20   directly or indirectly:

21       (a)    with scienter, employed devices, schemes, or artifices to defraud;

22       (b)    obtained money or property by means of untrue statements of a

23   material fact or by omitting to state a material fact necessary in order to make the

24   statements made, in light of the circumstances under which they were made, not

25   misleading; or

26       (c)    engaged in transactions, practices, or courses of business which

27   operated or would operate as a fraud or deceit upon the purchaser.

28       136.   By engaging in the conduct described above, all of the defendants

1   violated, and unless restrained and enjoined will continue to violate, Sections

2   17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1),

3   77q(a)(2), & 77q(a)(3).

4   ## THIRD CLAIM FOR RELIEF

5   ### [Sale of Unregistered Securities]

6   ### Violations of Sections 5(a) and 5(c) of the Securities Act

7   ### (against Defendants BIC and Nase)

8       137.   The SEC realleges and incorporates by reference paragraphs 1 through

9   127 above.

10      138.   Defendants, by engaging in the conduct described above, directly or

11  indirectly, made use of means or instruments or transportation or communication in

12  interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or

13  cause such securities to be carried through the mails or in interstate commerce for the

14  purpose of sale or for delivery after sale.

15      139.   No registration statement has been filed with the SEC or has been in

16  effect with respect to any of the offerings alleged herein, and no exemption from

17  registration applies.

18      140.   By engaging in the conduct described above, Defendants have violated,

19  and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of

20  the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

21  ## PRAYER FOR RELIEF

22      WHEREFORE, the SEC respectfully requests that the Court:

23  ### I.

24      Issue findings of fact and conclusions of law that Defendants committed the

25  alleged violations.

26  ### II.

27      Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

28  Civil Procedure, temporarily, preliminarily, and permanently enjoining Defendants,

and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### III.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction against all Defendants, freezing the assets of Defendants BIC Real Estate Development Corp. and Daniel R. Nase, and their respective subsidiaries and affiliates, and freezing the assets of Relief Defendants BIC Solo 401k Trust and Margarita Nase traceable to the fraud; prohibiting all Defendants from destroying documents; granting expedited discovery; requiring accountings from Defendants; and appointing a Receiver over BIC Real Estate Development Corp. and its subsidiaries, including but not limited to Tier 1 Solar Power Company, LLC; Tier 1 Solar Power Company; WM Petroleum; Target Oil & Gas Drilling, Inc.; and Home Sweet Holdings, and all of their subsidiaries and affiliates.

### IV.

Order Defendants and Relief Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of

1   all orders and decrees that may be entered, or to entertain any suitable application or

2   motion for additional relief within the jurisdiction of this Court.

3                                                **VII.**

4        Grant such other and further relief as this Court may determine to be just and

5   necessary.

6   Dated:  March 11, 2016

7

8                                        _____
                                         Manuel Vázquez
9                                        Attorney for Plaintiff
                                         Securities and Exchange Commission
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                              25