# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | Case No. 1:16-cv-00344-LJO-JLT |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR MONETARY RELIEF** |
| v. | |
| **BIC REAL ESTATE DEVELOPMENT CORPORATION and DANIEL R. NASE, individually and d/b/a BAKERSFIELD INVESTMENT CLUB,** | **(ECF No. 171)** |
| **Defendants,** | |
| **BIC SOLO 401K TRUST and MARGARITA NASE,** | |
| **Relief Defendants.** | |

## I. INTRODUCTION

Plaintiff U.S. Securities and Exchange Commission ("Plaintiff" or "SEC") moves for monetary remedies against Defendant Daniel R. Nase ("Defendant" or "Nase"), consisting of disgorgement (with prejudgment interest), and civil penalties. (ECF No. 171.) For the reasons set forth below, the Court grants the motion.

## II. BACKGROUND

From June 2013 through March 2016, Nase and his company, BIC Real Estate Development Corporation ("BIC"), raised approximately $15.9 million from approximately 549 investors in the fraudulent offer and sale of unregistered securities. (Complaint ("Compl.") ¶ 4, ECF No. 1; Declaration of David P. Stapleton ("Stapleton Decl.") ¶ 7, ECF No. 171-3.) BIC represented itself as a real estate investment company, buying real estate primarily located in Bakersfield, California, and renting or

1

flipping it for profit. (Compl. ¶ 20.) Nase was the CEO, president, and "Managing Shareholder" of BIC, and was in control of BIC's day-to-day operations. (*Id.* ¶ 21.) Beginning around June or July of 2013, BIC and Nase raised money from the offer and sale of BIC securities to investors. (*Id.* ¶ 24.) Nase and BIC solicited investors through the "Bakersfield Investment Club" and similar purported investment clubs. (*Id.* ¶ 25.) Nase deposited investor funds into BIC's bank accounts, or accounts held in the name of the Bakersfield Investment Club, which Nase controlled as a signatory. (*Id.* ¶ 35.) At all relevant times, no registration statement had been filed with the SEC for BIC's securities or for the offering of securities by Nase and BIC. (*Id.* ¶ 37.)

Prospective investors were named "directors" of BIC, which, according to Nase's representation, qualified them as "accredited investors" under SEC regulations. (*Id.* ¶ 33.) They were also provided with a packet of offering materials that varied over time, including documents titled "Investment Club Agreement," "Shareholder Agreement," and a "Confidential Private Placement Memorandum." (*Id.* ¶ 34.) The Investment Club Agreement purported to comply with SEC rules. (*Id.* ¶ 40.) Nase tracked investors' shares, including his own, in a "Member Ledger." (*Id.* ¶ 36.)

Initially, Nase purchased property with investor funds but then misappropriated the ownership by titling the property, in whole or in part, in his name, his wife's name, or the name of the Nases' trust, Relief Defendant BIC Solo 401k Trust. (*Id.* ¶ 53.) During this period, Nase also misappropriated approximately $484,000 in investor funds for his personal LendingClub.com account, and another $84,000 to pay his personal expenses, even though he was also paying himself and his wife a generous salary. (*Id.* ¶ 53.)

After the SEC staff subpoenaed Nase to testify in May 2015, Nase transferred title of many of the misappropriated properties to BIC. (*Id.* ¶ 54.) However, in exchange, he awarded himself approximately $1 million in BIC shares for contributing those assets as capital to BIC. (*Id.*) Nase also misappropriated over $3 million of investor funds to buy Target Oil, which was ultimately owned by Nase and his wife's BIC Solo 401k Trust. (*Id.*) During this period, Nase increased his ownership of BIC

in the Member Ledger from 10,000 shares to over 629,000 shares, representing a $6.29 million investment. (*Id.* ¶ 54.)

Lastly, in January 2016, Nase implemented a "liquidation plan" for BIC. (*Id.* ¶ 100-101.) The plan, which was explained to investors in February 2016 as having been developed in response to the SEC's investigation, proposed to distribute BIC assets (such as real property) to investors pro rata based on their ownership of BIC stock. (*Id.* ¶ 93.) The plan claimed that BIC had 1,730,417 total outstanding shares, representing "investments totaling $17,304,163.48." (*Id.* ¶ 94.) Of the total investments, Nase represented that $6,299,525 (or approximately 36%) of the shares were held by Nase and his wife. (*Id.*) Nase and his wife had in fact made cash investments of less than $425,000 in BIC, excluding investments that were made with assets Nase had previously misappropriated. (*Id.*) Under the liquidation plan, Nase was to get assets valued over $6 million, including the oil company, the solar company, and a property management company. (*Id.* ¶¶ 93, 102.) Nase began to implement the liquidation plan before the SEC filed this action. (*Id.* ¶ 106.)

On March 11, 2016, shortly after the SEC gave notice to Nase's counsel of its intent to file an emergency action seeking a TRO and asset freeze, Nase made four visits to Wells Fargo to withdraw a total of $60,000 in cash, withdrew over $15,000 from a Bank of the West account, transferred five properties to an entity named "FIC Solo 401k Trust," transferred a property to his stepson, and transferred 16.8428% of a property to ten investors. (ECF No. 23 at 8-9.) On March 10, 2016, Nase and his wife obtained personal lines of credit advances totaling $93,962.29 from Capital One credit card accounts. (ECF No. 48.) Those funds are currently being held in the Vick Law Group client trust account, pursuant to the parties' stipulation and an order of this Court. (*Id.*) On Saturday March 12, 2016, after this Court ordered certain assets frozen, Nase directed one of his employees to change the account that direct deposits to Target Oil were flowing into from an account frozen by the Court to an account at Bank of the West that Nase believed the SEC did not know about. (*Id.*)

Defendant consented to the entry of a judgment against him on July 14, 2016, (Consent of Daniel

Nase ("Consent") ECF No. 79), and the Court entered judgment on July 26, 2016, (ECF No. 83). Defendant agreed in the Consent that he is liable for disgorgement, prejudgment interest, and a civil penalty. (ECF No. 79 ¶ 3.) Defendant also agreed that in connection with this motion for monetary remedies, he would be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint, and that the Complaint would be accepted as and deemed as true for the purposes of this motion. (*Id.*)

Ms. Nase was originally named as a Relief Defendant in this action. On March 22, 2017, the SEC filed a Stipulation to Dismiss Claims Against Relief Defendant Margarita Nase. (ECF No. 177.) The stipulation stated that the Receiver, David P. Stapleton ("Receiver"), had informed the SEC that it recovered from Ms. Nase, "all funds and/or property in her possession, custody, or control which were traceable to the alleged fraud." (*Id.*) The Court entered the order the same day. (ECF No. 179.)

### III. DISCUSSION

The SEC now seeks disgorgement of ill-gotten gains, including prejudgment interest, and civil monetary penalties against Defendant Nase. Once a district court has found federal securities laws violations, it has "broad equitable power to fashion appropriate remedies." *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007). Pursuant to Defendant's consent decree, the court has enjoined Defendant against future violations of the securities laws. (*See* Consent ¶ 1(a).) Because Nase stipulated to the Complaint's allegations for the purpose of the Court's order regarding disgorgement and civil penalties (*Id.* ¶ 3), his liability is not at issue. Therefore, the Court will proceed under the terms of the consent decrees and order Nase to pay disgorgement of ill-gotten gains, prejudgment interest, and civil penalties. (*Id.* ¶ 1.)

**A.     Disgorgement**

To establish an appropriate disgorgement amount, the SEC must show a "reasonable approximation" of Defendant's ill-gotten gains causally connected to the violation. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010). Once the SEC has made such a showing, the

burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Id.*

The SEC seeks $12,132,370 in disgorgement, plus $491,593.47 in prejudgment interest, from Defendant. (ECF No. 171-1 at 1.) The Receiver's declaration establishes that $12,132,370 is a reasonable approximation of Defendant's gross pecuniary gain. (Stapleton Decl. ¶ 7, Ex. A.) That figure is based on the total amount received from investors, approximately $15.9 million, less the approximately $3.8 million paid to investors. (*Id.*) Defendant "does not oppose a disgorgement award of this amount," (ECF No. 203 at 1), but asks the Court to make three clarifications with respect to disgorgement: 1) that disgorgement only be awarded against Defendant, not his wife, Margarita Nase, 2) that disgorgement of "untainted cash" obtained from personal credit card advances by both Defendant Nase and Ms. Nase prior to the SEC filing should be postponed pending counsel's application for attorney's fees, and 3) that money collected by the Receiver and paid to investors should be credited against the disgorgement award.

With respect to Defendant's first two concerns, the SEC argues that Margarita Nase's $50,000 cash advance and Defendant Nase's $43,962.29 cash advance should be available to satisfy judgment against Nase. In a Stipulation and Order entered on April 22, 2016, the Court froze the two cash advances paid to Defendant Nase and Margarita Nase prior to the filing of the SEC's Complaint. (ECF No. 48.) The Order provides that those funds "must be preserved in their entirety, and not drawn upon, pending further order of the Court." (*Id.* at 3.) In their opening brief, the SEC argues that the cash advance funds being held in escrow should be paid to the Receiver in partial satisfaction of Defendant's disgorgement obligations. (ECF No. 171-1 at 15 n.4.) The SEC suggests "in the alternative" that the funds be returned to Defendant's credit card company. (*Id.*) Defendant argues that these funds are "untainted" and that disposition of those funds should be postponed pending counsel's application for attorney's fees from those funds. (ECF No. 203 at 1.) With respect to Defendant's general objections, whether the money is "tainted" or not is irrelevant for purposes of disgorgement. The judgment against

5

Nase needs to be satisfied with available funds, not necessarily funds directly traceable to ill-gotten gains. With respect to the cash advances taken out by Defendant Nase and Ms. Nase, currently in defense counsel's escrow account, the Court defers decision on whether those funds can be used in satisfaction of Defendant's disgorgement obligations. As both parties have suggested, the Court does not have all of the relevant information before it and has not yet heard from all of the interested parties, including the credit card company.[1]

Based on the SEC's representation, the Court understands that the $50,000 cash advance is the only asset arguably belonging to Ms. Nase that is currently in dispute. As noted, that asset has already been frozen by this Court. (ECF No. 48.) The SEC, with input from the Receiver, has stipulated to dismissing Ms. Nase from this action. (ECF No. 179.) To the extent the Ms. Nase possesses other funds that have not been frozen by the Court or recovered by the Receiver, the Court agrees that those funds are not subject to disgorgement at this time.

Defendant's third request is that money paid to the Receiver should be credited towards his disgorgement obligations. On May 1, 2017, after the parties briefed this motion, the Court entered judgment against Defendant BIC, ordering it to pay the same amount of disgorgement ($12,623,963.47) "jointly and severally" with Defendant Nase. (ECF No. 219.) Therefore, money collected by the Receiver and paid to investors will count towards satisfaction of the joint and several disgorgement obligations of Defendant Nase and Defendant BIC. The Court ORDERS Defendant Nase, jointly and severally with Defendant BIC, to pay $12,623,963.47 in disgorgement of ill-gotten gains and prejudgment interest, and will amend the SEC's proposed judgment to clarify that the disgorgement ordered is joint and several with BIC.

---

[1] Defendant suggests that the funds should be held pending his request for attorney's fees. (ECF No. 203 at 6-7.) Although the SEC contends that the funds should be used in satisfaction of disgorgement, it states in its reply "at a minimum, the funds should remain frozen until a properly noticed motion is presented to the Court seeking relief from the freeze. At that time, the Court may also wish to hear from Capital One, which may have an interest in the funds." (ECF No. 208 at 10.)

6

**B.     Civil Penalties**

The SEC seeks an additional $12,132,370 in third-tier civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). The civil penalty amount is intended to match Nase's pecuniary gain. (ECF No. 171-1 at 15.) Defendant opposes the amount on the grounds that it is excessive and unwarranted by the undisputed facts. Defendant asks that the Court instead award Plaintiff either a nominal civil penalty or a much lower civil penalty.

The Securities Act and Exchange Act provide for three tiers of penalties, with the amount of any penalty "determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(3)(B), 78u(d)(2)(A). First-tier penalties are the least severe and may be imposed for any violation of the relevant securities law. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). Second-tier penalties may be imposed for any securities violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* Third-tier penalties are the most severe and may be imposed for a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," *and* if the violation creates substantial losses or significant risk of substantial losses to other persons. *Id.*

The relevant statutes provide that the amount of a third-tier civil penalty shall not exceed the greater of (i) $100,000 for each violation for a natural person or (ii) the gross amount of pecuniary gain to the defendant. §§ 77t(d), 78u(d)(3). For third-tier penalties involving violations that occurred after March 5, 2013, the statutory amount for a natural person is $160,000. 17 C.F.R. § 201.1005 (setting forth inflation adjustments for civil penalties for conduct occurring after March 5, 2013). The amount of the civil penalty imposed within each tier is discretionary. *See SEC v. Brookstreet Sec. Corp.*, 664 F. App'x 654, 656 (9th Cir. 2016).

**1.     Information Considered by the Court**

Defendant is precluded from arguing that he "did not violate the federal securities laws as

7

alleged in the Complaint" for the purposes of this motion. (Consent ¶ 3.) In setting the civil penalty "in light of the facts and circumstances," the Court assumes the facts alleged in the Complaint are true. The parties further agreed that the Court "may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." (*Id.*)

Defendant objects to the Court's considering certain evidence in assessing what civil penalty is appropriate in light of the "facts and circumstances." First, Defendant objects to the Court's considering the declaration of attorney Dixon Kummer, which undermines Defendant's argument that he was acting in reliance on the advice of counsel. (ECF No. 203 at 3.) According to his brief, "Defendant maintains to this day that he consulted with and obtained advise [sic] from Attorney Kummer" and describes the issue of reliance on counsel as "hotly contested." (*Id.*) The SEC contends that Mr. Kummer's declaration is highly relevant because it demonstrates that Defendant acted with a high degree of scienter, provided false testimony to the SEC, and that Defendant co-opted Mr. Kummer's name, going so far as to forge his signature on company documents. (ECF No. 208 at 6-8.) As an initial matter, the Complaint alleges that Defendant committed securities fraud with scienter. (*See* Compl. ¶¶ 56, 108, 132, 135.) Therefore, Defendant is precluded for the purposes of this motion from arguing that he relied in good faith on the advice of counsel to the extent that his argument undercuts the allegations of scienter in the Complaint. (Consent ¶ 3); *see also SEC v. Goldfield Deep Mines Co. of Nev.,* 758 F.2d 459, 467 (9th Cir. 1985) (examining a good faith defense in the context of entry of a permanent injunction because an injunction may be entered only upon a finding of scienter to violate the securities laws). Moreover, in accordance with the Consent, the Court may, but need not, consider Mr. Kummer's declaration regardless of whether it contains facts disputed by the parties. (*Id.*) However, the Court *cannot* draw the inference that Defendant is not culpable for the fraud because he relied on legal counsel.

Second, Defendant objects to the SEC's characterization that Defendant's titling the properties

8

purchased with investor monies in his name was nefarious because, according to Defendant, BIC was unable to obtain mortgages in its own name and in obtaining the mortgages Defendant was personally liable for them. (ECF No. 4.) To the extent that this additional "context" is an attempt to explain away Defendant's fraudulent conduct, it is unavailing. As noted, Defendant is precluded from doing so by the Consent. (Consent ¶ 3.) The Complaint specifically alleges that Nase *fraudulently* misappropriated investor property. (Compl. ¶¶ 54, 62-65.) No further context is required for the purposes of this motion.

Lastly, Defendant contends that this Court should not consider Defendant's instructions to his employee to divert royalty payments on the day of this Court's order freezing his assets. (ECF No. 203 at 4.) Defendant suggests that while his actions were "impulsive, immature, and unwise," they were motivated by a desire to look out for his employees. (*Id.*) Regardless of the motivation, there is no doubt or dispute that Defendant's actions were a direct violation of this Court's order freezing his assets. The Court considers that information relevant to assessing the "facts and circumstances" in determining the appropriate civil penalty.

### 2. SEC's Recommended Civil Penalty

The purpose of civil penalties is to punish the individual wrongdoer and to deter future wrongdoing. *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014). In assessing appropriateness of a civil penalty, courts consider the factors set forth in *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). *See SEC v. Alpha Telcom, Inc.*, 187 F. Supp. 2d 1250, 1263 (D. Or. 2002) (applying the factors for determining the appropriateness of injunctive relief in determining the appropriateness of a civil penalty), *aff'd sub nom. SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003). Those factors are: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of his assurances against future violations. *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).

Here, both the requirements for imposition of a third-tier civil penalty under the statute are met.

§§ 77t(d), 78u(d)(3) The allegations in the Complaint, which are undisputed for the purposes of this motion, establish that Defendant Nase perpetrated an extensive fraud. (*See, e.g.*, Compl. ¶¶ 53-56.) His fraudulent scheme created a significant risk of substantial losses to his investors by misappropriating millions of dollars of investor funds. (*Id.*)

The *Murphy* factors also weigh in favor of imposing a civil penalty. Regarding the first factor, Defendant Nase acted with a high degree of scienter, as evidenced by the fact that he misappropriated investor funds and characterized those funds as his own *personal* capital contribution to BIC. After the SEC began investigating Nase and BIC, he purported to liquidate the investments, retaining $6 million of the assets for himself and obstructing the ability of regulators and the courts to recover those assets and distribute them equitably among his victims.

Moreover, Defendant attempted to explain his conduct to the SEC by indicating that he relied on the advice of his attorney, Dixon Kummer. Mr. Kummer provided sworn testimony to the SEC repudiating Nase's claims. (*See, e.g.*, Kummer Decl. ¶¶ 20-24.) Mr. Kummer also stated that Nase appeared to have co-opted Mr. Kummer's name for several of his corporations without his knowledge, including forging his signature on a document provided to the SEC. (*Compare* Nase Decl. ¶ 38, Ex. 2 *with* Nase Decl. ¶ 38, Ex. 23.) Based on the uncontroverted statements contained in Mr. Kummer's declaration, and the attached documents, the Court is persuaded that, at a minimum, Nase provided false testimony to the SEC regarding Mr. Kummer's involvement in BIC and that he co-opted his name for his business enterprises. Nase repeatedly and brazenly misrepresented the truth of his fraudulent scheme to his investors and to the SEC.

As to the second factor, Nase's fraud extended over several years, and continued to evolve in response to regulatory scrutiny.

With respect to the third factor, aside from entering into a consent decree, Nase has done nothing to recognize the wrongful nature of his conduct. *See SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192-93 (D. Nev. 2009). Indeed, after becoming aware that the SEC was going to seek emergency

relief, Nase attempted to secure his gains by making several withdrawals from different accounts and different banks. Nase also transferred several properties to his stepson and his trust in attempt to avoid having the assets frozen. Furthermore, Nase violated this Court's order by instructing one of his employees to have his royalty payments to a bank account that Nase believed that the SEC did not know existed in an attempt to circumvent the asset freeze. These actions demonstrate Nase's ongoing effort to profit from his wrongdoing, even after he was aware that he would be subject to regulatory action.

With respect to the fourth and fifth factors, Defendant suggests that he has not been able to secure employment since the discovery of the fraud and that he has "little prospect of finding gainful employment." (ECF No. 203 at 9.) However, the Court is not persuaded that Defendant would not violate securities laws in the future given his conscious disregard for the law, his deceptive conduct and false statements to investigators, and his repeated attempts to prevent the recovery of his ill-gotten gains. The Court finds that these factors also weigh in favor of imposing a civil penalty.

The Court has determined that a penalty is appropriate in this case. *See SEC v. Vassallo*, 22 F. Supp. 3d 1063, 1068-69 (E.D. Cal. 2014).[2] The SEC asks the Court to impose a civil penalty equal to disgorgement. (ECF No. 171-1 at 18.) Courts frequently authorize civil penalties equal to the amount of

---

[2] The SEC posits that it could have sought a $160,000 statutory penalty for each of the 549 investors that were victims of Defendant's fraud, for a total maximum penalty of $87,840,000.00. (ECF No. 208 at 5-6.) Therefore, the SEC suggests that by asking for only for an amount equal to Defendant's pecuniary gain, it is offering a "substantial discount from the maximum possible penalty available under the statutory scheme." (*Id.*) The statutory scheme allows a maximum $160,000 penalty "for each violation." Neither the Securities Act nor the Exchange Act defines the phrase "for each violation." Although some courts have interpreted each violation to mean each victim, *see SEC v. Integrity Financial AZ, LLC*, No. 1:10 CV 782, 2012 WL 176228 (N.D. Ohio Jan 20, 2012), the weight of authority favors interpreting each violation to mean each scheme in which the defendant was involved. *See SEC v. Murray*, No. 12-CV-01288-EMC, 2016 WL 6893880, at *9-10 (N.D. Cal. Nov. 23, 2016); *SEC v. Garfield Taylor, Inc.*, 134 F. Supp. 3d 107, 110 (D.D.C. 2015) ("[T]he Commission asserted that courts have considered each victim of a scheme to constitute a separate violation, but did not offer specific support for that proposition. While the Court has found some support for the position, other courts have assessed only a single penalty where the violations arose from a single scheme or plan."); *SEC v. Stanard*, 2009 WL 196023, at *35 (S.D.N.Y. 2009) ("While there were technically multiple violations of various provisions of the securities laws, all of them resulted from a single scheme. Accordingly, the Court concludes that a total penalty of $100,000 is appropriately imposed for defendant's violations."); *CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193 ("the Commission's suggested number of violations would result in excessive penalties."). Although the Court does not decide the issue here, it is dubious of the SEC's claim that a penalty of over $87 million would be appropriate, or that the penalty totaling over $12 million is a discount on what Defendant could otherwise receive, never mind a "substantial" one. *SEC v. iShopnomarkup.com, Inc.*, 126 F. Supp. 3d 318, 333 (E.D.N.Y. 2015) ("while the Court finds that civil monetary penalties are appropriate in this case, considering each sale to the 350 investors as a separate violation results in an 'unduly penalizing' amount").

11

disgorgement. *See, e.g.*, *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193 (D. Nev. 2009) (assessing a civil penalty equal to the amount of defendants' pecuniary gain); *SEC v. Driver*, No. 2:09-CV-03410-ODW, 2014 WL 6882854, at *3 (C.D. Cal. Dec. 4, 2014) (assessing a civil penalty over $3 million equal to defendant's ill-gotten gains); *SEC v. Wheeler*, 56 F. Supp. 3d 241, 246 (W.D.N.Y. 2014) (same); *SEC v. Brandonisio*, No. 2:11-CV-2011-JAD-VCF, 2013 WL 5375283, at *9 (D. Nev. Sept. 24, 2013) (imposing a civil penalty of over $2.4 million, equal to defendant's gross pecuniary gain); *SEC v. Zada*, 787 F.3d 375, 383 (6th Cir. 2015) (upholding imposition of civil penalty, equal to the amount of ill-gotten gains, of over $56 million); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (ordering a $15,000,000 penalty equal to the disgorgement amount "due to difficulty calculating total number of violations"); *SEC v. Interlink Data Network, Inc.*, No. 93-3073 R, 1993 WL 603274, *13 (C.D. Cal. Nov. 15, 1993) (ordering a $12,285,035 penalty equal to the disgorgement amount).

Defendant asks the Court to consider his ability to pay in imposing a civil penalty. (ECF No. 203 at 7-10.) Indeed, Defendant contends that it is one of the "most important" factors in assessing a civil penalty, citing *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014). (*Id.* at 8.) A close reading of *Monterosso* and other case law assessing civil penalties does not support for this proposition. In *Monterosso*, the Eleventh Circuit expressly noted that "[a]t most, ability to pay is one factor to be considered in imposing a penalty," noting that "nothing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay." *Id.* (citations omitted); *see also SEC v. Druffner*, 802 F. Supp. 2d 293, 298-99 (D. Mass. 2011) (declining to impose civil penalty where defendants were ordered to pay disgorgement, had little ability to pay, had paid other criminal and civil fines, and had cooperated with law enforcement authorities). Although the Court may consider ability to pay in assessing the totality of the circumstances, there is no support for Defendant's contention that the Court *must* consider inability to pay as the most important factor. Here, Nase indicates that he has been unemployed since the SEC brought this action and is essentially insolvent.

(Declaration of Daniel Nase (Nase Decl.") ¶ 2-5, ECF No. 203-1.) Nase is not currently earning any income, and has little prospect of finding gainful employment. (*Id.*) Nonetheless, in light of the seriousness of Nase's offense, the Court gives minimal weight to Defendant's inability to pay the civil penalty. *See SEC v. Murray*, No. 12-CV-01288-EMC, 2016 WL 6893880, at *9-10 (N.D. Cal. Nov. 23, 2016) (refusing to excuse defendant from penalties based on his inability to pay "because to do so would compromise 'the purposes of the securities laws.'") (citations omitted); *Brookstreet Sec. Corp.*, 664 F. App'x at 656 ("Nothing in the Act requires courts to impose penalties based on a wrongdoer's . . . ability to pay."); *SEC v. Warren,* 534 F.3d 1368, 1370 (11th Cir. 2008) ("At most, ability to pay is one factor to be considered in imposing a penalty," and "nothing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay.").

      Defendant also claims that the SEC's penalty calculation is inappropriate because there has not yet been a determination of investor losses. (ECF No. 203 at 2-3.) Defendant asserts that investor losses are "relevant to penalties." (*Id.*) Third-tier civil penalties are appropriate only where the violation "directly or indirectly resulted in substantial losses *or created a significant risk of substantial loss* to other persons." *See* §§ 77t(d), 78u(d)(3) (emphasis added). As explained above, the SEC has satisfied its burden of showing that the scheme subjected investors to a significant risk of substantial losses. The Complaint so alleges and Defendant has admitted to the factual content of the Complaint. *See* Compl. ¶¶ 53-56; *see also SEC v. Schooler*, No. 3:12-CV-2164-GPC-JMA, 2016 WL 4055705, at *4 (S.D. Cal. Jan. 21, 2016) (rejecting defendant's contention that investor losses in a fraudulent scheme must be calculated prior to imposition of a civil penalty where "it seems incontrovertible that investors suffered a significant and substantial risk of loss the instant they purchased [the unregistered securities]") (citation omitted). To the extent that Defendant is arguing that investor losses are relevant to the calculation of *how much* the civil penalty should be, Defendant cites no support for that proposition, and this Court can find none. The relevant statutes allow for a maximum penalty equal to Defendant's ill-gotten gains. Investor losses are irrelevant to that consideration, as Defendant concedes. (ECF No. 203 at 2 (noting

that investor losses are "not a factor relevant to disgorgement," i.e. ill-gotten gains).) Defendant's argument that the Court must calculate the precise amount of investor losses prior to awarding civil penalties is without merit.

Finally, Defendant argues that a civil penalty of this amount is unconstitutional under the Eighth Amendment's prohibition on excessive fines. (ECF No. 203 at 10.) A civil penalty does not violate the Eighth Amendment unless it is "grossly disproportional" to the gravity of the violation. *Brookstreet Sec. Corp.*, 664 F. App'x at 656 (citing *United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998)). The penalty that the SEC seeks here is not grossly disproportionate to the violation. Indeed, the SEC seeks an amount exactly equal to its conservative estimate of how much Defendant Nase profited from his wrongdoing. Given Defendant's "particularly egregious" conduct, the penalty is not unconstitutional. *Id.*

The Court therefore ORDERS Defendant Nase to pay a third-tier civil penalty of $12,132,370.

## IV. CONCLUSION AND ORDER

For the reasons stated above, the Court GRANTS Plaintiff's motion for monetary remedies in accordance with this Order. The Court will issue a final judgment consistent with this Order.

IT IS SO ORDERED.

Dated: **May 4, 2017**                    **/s/ Lawrence J. O'Neill**
                                                 UNITED STATES CHIEF DISTRICT JUDGE