| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>             **Plaintiff,**<br><br>        v.<br><br>**BIC REAL ESTATE DEVELOPMENT CORPORATION and DANIEL R. NASE, individually and d/b/a BAKERSFIELD INVESTMENT CLUB,**<br><br>             **Defendants,**<br><br>**BIC SOLO 401K TRUST and MARGARITA NASE,**<br><br>             **Relief Defendants.** | Case No. 1:16-cv-00344-LJO-JLT<br><br>**MEMORANDUM DECISION AND ORDER DENYING VALLEY MORTGAGE INVESTMENTS, INC.'S MOTIONS FOR:**<br><br>(1) **RELIEF FROM STAY ON NOTICING LOAN DEFAULTS FOR PROPERTIES HAVING UNMARKETABLE TITLE**<br>(2) **PROVIDING INSTRUCTIONS TO THE RECEIVER**<br>(3) **ATTORNEY'S FEES**<br><br>(ECF Nos. 183, 184) |

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

## I. INTRODUCTION

Valley Mortgage Investments, Inc. ("VMI") is a non-party proposed intervenor that represents a group of lenders on thirty-six private money mortgage loans secured by real property held within the receivership. VMI moves this Court for (1) relief from stay on noticing loan defaults for eight properties held by the receivership that have unmarketable title; (2) an order providing instructions to the Receiver; and (3) attorney's fees for their motion to intervene, which was resolved by stipulation on January 23, 2017. For the reasons set forth below, the Court denies VMI's motions.

## II. BACKGROUND

On March 11, 2016, the Securities and Exchange Commission ("SEC" or "Commission") brought a civil enforcement action against BIC Real Estate Development Corporation ("BIC") and its owner Daniel R. Nase ("Nase") (collectively, "Defendants") for securities fraud. The Complaint alleged

that Nase and BIC raised millions of dollars from investors in the fraudulent offer and sale of unregistered securities. (Complaint ("Compl.") ¶ 4.) BIC represented itself as a real estate investment company, buying real estate primarily located in Bakersfield, California, and renting or flipping it for profit. (Compl. ¶ 20.) In response to the SEC's investigation, but prior to the initiation of the SEC's action, Nase implemented a "liquidation plan" for BIC. (*Id.* ¶ 100-101.) The plan distributed some of BIC's assets (such as real property) to investors pro rata based on their ownership of BIC stock. (*Id.* ¶ 93.) As a result, some fractionalized interest in certain real properties held by BIC was conveyed to investors. (*Id.*)

On April 8, 2016, the Court appointed David Stapleton as the permanent receiver ("Receiver"), and charged him with marshaling and managing the assets underlying the fraudulent scheme. (ECF No. 42.) Included in BIC's holdings were approximately sixty residential real estate properties primarily located in or near Bakersfield, California. (Compl. ¶¶ 20, 62.) On September 19, 2016, the Court approved stipulated procedures for the Receiver to sell residential real properties held by the receivership. (ECF No. 93.) Since that time, the Receiver has obtained Court approval to sell twenty-nine properties. The Receiver regularly provides progress reports to the Court.

VMI is the assignee for a group of lenders on thirty-six private money mortgage loans secured by real property held in the receivership. (ECF No. 183-1 at 1.) VMI asserts that the current principal owed on the outstanding loans is in excess of $3 million. (*Id.*) The Court's April 8, 2016 order staying foreclosure prevents VMI or any other lender from foreclosing on the properties held in the receivership. (ECF No. 42.)

VMI filed a motion to intervene in this case on September 14, 2016, citing concerns that loan and property tax payments had ceased on VMI-serviced loans held by the receivership. (ECF No. 91.) VMI also raised concerns with how the properties were being managed and marketed by the Receiver, asserting that their interests were not being properly protected. (*Id.* at 2.) On October 27, 2016, the Court entered an Order asking the Receiver to respond to VMI's allegations and encouraging the parties to

meet and confer regarding VMI's concerns. (ECF No. 110.) On December 21, 2016, the Court issued an order noting that the parties had resolved most of the disputes raised in VMI's motion to intervene, except whether VMI was entitled to attorney's fees and costs associated with its motion. (ECF No. 142.) The order explained that the Court could not issue an advisory opinion with regard to the attorney's fees issue, and asked them to inform the Court whether or not they wanted a ruling from the Court on VMI's motion to intervene. (*Id.*) The parties entered into a stipulation, approved by the Court on January 23, 2017, in which they agreed that VMI's beneficiary demands for each property may include an attorney's fees and costs component payable to VMI, not to exceed $3,000, which funds would be maintained by the Receiver. (Stipulation and Order re: VMI's Motion to Intervene ("Stipulation"), ECF No. 154.) Since that time, the Receiver has made monthly payments on the loans, and has paid all outstanding principal, interest, and other fees upon the closing of each sale of receivership real property. (ECF No. 204 at 6-7, Ex. A.)

On March 31, 2017, VMI filed two motions. (ECF Nos. 183, 184.) The first motion requested partial motion to lift the stay to allow VMI to foreclose on eight properties for which the Receiver has not yet acquired marketable title, and for the Court to give certain instructions to the Receiver regarding the marketing of other properties held by the receivership. (ECF No. 183.) VMI's second motion requested payment of attorney's fees incurred during their motion to intervene in the amount of $48,419.16. (ECF No. 184-1.)

The factual basis for VMI's motion to partially lift the stay is primarily based on the declaration of its President, Mark Augustine, who made personal observation of two of the properties for which the Receiver has not yet acquired marketable title and noted that they were in a state of neglect and disrepair. (Declaration of Mark Augustine ("Augustine Decl."), ECF No. 183-4.) One of the properties, located at 912 Meadows Street, has reportedly been occupied by squatters on at least two occasions and had been tagged as unsafe by Code Enforcement. (*Id.* ¶¶ 13-14.) Mr. Augustine discovered that another property, located at 715 Arvin Street, was occupied by an individual claiming to be a tenant and

3

possessing a fraudulent rental agreement. (*Id.* ¶¶ 15-16.)

In its opposition, filed April 19, 2017, the Receiver describes its attempts to secure and inspect the properties described in Mr. Augustine's declaration. (ECF Nos. 204 at 8-10.) Both the Receiver and the SEC also argue that these two anecdotal observations are not representative of how all of the receivership properties are being managed, and note that the Receiver has to make decisions about how to spend limited time and resources to ensure maximum recovery for the receivership estate as a whole. (ECF No. 204 at 9-10; ECF No. 206 at 8.) Both parties also noted that the Receiver may require the assistance of the Court in obtaining marketable title from the non-cooperating investors. (ECF No. 204 at 5; ECF No. 206 at 6.) Recently, the Receiver filed a motion seeking the Court's assistance in restoring all of the remaining property interests to the receivership. (ECF No. 220.)

The factual basis for VMI's request for additional instructions regarding the marketing of properties held by the receivership is primarily based on Mr. Augustine's observation that several properties were listed without interior photos, were not available for public showings, were occupied by tenants, were listed for sale "as is" which can be an impediment to obtaining FHA financing, and were listed for prices at the top of the market despite having issues "not conducive to attaining an offer at or near the top of the market." (Augustine Decl. ¶ 17.) VMI also pointed out that many VMI-serviced properties have been on the market for more than 100 days. (ECF NO. 183-1 at 4.) In its opposition, the Receiver contends that it has been marketing and selling the properties successfully in compliance with the sales requirements of 28 U.S.C. § 2001, *et seq.*, as well as this Court's order approving the Receiver's sales procedures (ECF No. 93), and that no further instructions from the Court are necessary. (ECF No. 204 at 13.)

VMI also generally asserts that the Receiver has been uncooperative in sharing information with them, despite their agreement to do so during the meet and confer process that took place in connection with VMI's motion to intervene. Specifically, VMI alleges that the Receiver has refused to provide rental rolls or to provide a plan for restoring ownership to the properties having unmarketable title,

4

despite numerous requests. (ECF No. 183-1 at 7.) The Receiver disputes these contentions in its opposition. (ECF No. 204 at 9-10.)

### III. DISCUSSION

District courts have "broad powers and wide discretion" to fashion relief and administer federal receiverships. *SEC v. Wencke*, 622 F.2d 1363, 1371 (9th Cir. 1980). "The federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." *Id.* at 1369.

**A.    VMI's Standing**

The Receiver argues that VMI lacks standing to file these motions. (ECF No. 204 at 11; ECF No. 205 at 3-4.) VMI counters that as the assignee of thirty-six loans held by the receivership, it stands in the shoes of the lender and therefore has standing to assert its claims. VMI argues that an assignee should be treated as a real party in interest under Rule 17(a). (ECF No. 211 at 5-6 (citing 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1545 (3d ed. 2017)).)

The Court agrees that VMI is a real party in interest that has standing to raise issues on behalf of the lenders. *See Sprint Comm. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275, 285-86 (2008) ("Assignees of a claim . . . have long been permitted to bring suit."). Therefore, the Court will consider the merits of each motion.

**B.    Relief from Stay on Noticing Loan Defaults for Properties Having Unmarketable Title**

A court may impose a stay for the purpose of protecting the assets in a receivership estate against claims by investors and creditors. *SEC v. United Fin. Grp., Inc.*, 576 F.2d 217, 221 n.8 (9th Cir. 1978); *see also S.E.C. v. Vescor Capital Corp.*, 599 F.3d 1189, 1196 (10th Cir. 2010) ("A receiver must be given a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant."). This Court entered a stay on April 8, 2016 to give the Receiver the opportunity to investigate Defendants' transactions and assets, to marshal and preserve those assets, and to determine how they should be distributed to provide a fair recovery for investors and

5

creditors. (ECF No. 42.)

The Ninth Circuit has set fourth three factors to consider in determining whether to lift a receivership stay in an SEC action:

> (1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.

*Wencke*, 742 F.2d at 1231. This test differs from the traditional criteria for determining whether to grant, deny, or continue a preliminary injunction in one important respect. While the traditional preliminary injunction test "would require the receiver to show a probability of success on the merits and irreparable harm to the receivership if the stay is not continued," in the *Wencke* test, a court simply balances the interest of the receiver against that of the moving party. *United Fin. Grp.*, 760 F.2d at 1038. Therefore, the district court's power to enter and to continue a blanket stay is broader than its authority to grant or deny injunctive relief under Federal Rule of Civil Procedure 65. *Id.* Moreover, the interests of the receiver are defined broadly to include not only protection of the receivership property, but also the protection of defrauded investors. *Id.*

VMI argues that the Court should lift the foreclosure stay as to the eight properties for which the Receiver has not been able to secure marketable title, and allow VMI to foreclose on them. VMI asserts that the Receiver is not protecting VMI's interests and is jeopardizing its ability to be repaid on its loans. (ECF No. 183-1 at 5-6, ECF No. 211.) VMI points in particular to anecdotal evidence that two of the eight properties are not being appropriately managed and administered. VMI's President Mark Augustine submitted a declaration indicating that sheriff deputies informed him they had arrested individuals squatting on the property at 912 Meadows Street on two occasions and that the property had been tagged for Code Enforcement as unsafe. (Augustine Decl. ¶¶ 13-14.) Mr. Augustine also determined that there were people living in the property at 715 Arvin Street under a fraudulent lease agreement even though the property was supposed to be unoccupied. (*Id.* ¶ 15.)

The Receiver and the SEC counter that the *Wencke* factors weigh in favor of keeping the stay in place. With respect to VMI's assertions, they further contend that VMI is not at risk of losing its secured capital, because the Receiver intends to sell all of the properties for amounts greater than that of the outstanding loans. Furthermore, both parties contend that the few "problem" properties do not indicate a widespread issue with the Receiver's management of the receivership, and that the Receiver has discretion to use the limited time and resources to ensure maximum recovery for the receivership. *See Bennett v. Williams*, 892 F.2d 822, 824 (9th Cir. 1989) (in the context of a bankruptcy receivership, courts "are deferential to the business judgment decisions of a bankruptcy trustee.").

  **1. Status Quo**

With respect to whether lifting the stay will status quo, VMI argues that it is at a substantial risk of serious harm, because the properties have sustained damage under the Receiver's care, and their value is at risk of decreasing further. (ECF No. 211 at 6.) The Receiver argues that the stay is preserving the status quo by allowing the Receiver to recover and sell the properties for the benefit of all investors and creditors, not just VMI. (ECF No. 204 at 11-12.) The SEC likewise argues that the stay prevents VMI from foreclosing on the properties and extinguishing or diminishing the prospect of recovery for the defrauded investors, who hold inferior claims. (ECF No. 206 at 4-5.)

In *SEC v. Universal Financial*, the Ninth Circuit affirmed the district court's refusal to lift a stay, where the stay preserved the status quo by preventing senior lienholders from extinguishing the rights of investors who held inferior liens. 760 F.2d at 1038. Likewise, in *SEC v. Byers*, the court rejected the movants' attempts to challenge an injunction imposed involving a Ponzi scheme, applying *Wencke*, and concluding that "the best way to maintain the status quo is to permit [the receiver] to carry on with his investigation." 592 F. Supp. 2d 532, 537 (S.D.N.Y. 2008).

Here, too, the best way to maintain the status quo is for the receiver to continue marshaling the assets and marketing and selling the real property in an efficient and equitable manner. Moreover, the Court is not persuaded that VMI will suffer any injury if the stay is not lifted. As to the seven VMI-

serviced properties that have been sold by the Receiver to date, VMI has received 100% of their principle, interest, and fees consistent with the procedures approved by the Court. (ECF No. 204 at 6-7, Ex. A.) Moreover, the Receiver plans and expects to be able to sell the remaining VMI-serviced properties "in excess of VMI's outstanding payoff amounts," meaning that VMI is over-secured. (ECF No. 204 at 12.) VMI has provided no evidence undermining this conclusion. The Receiver is also making monthly interest payments to VMI-serviced lenders, which are receiving high interest rates on their loans. (ECF No. 206 at 5.) The Receiver has sold numerous properties at prices in excess of VMI's outstanding payoff amounts, meaning that VMI has thus far been adequately secured through the receivership process. (*Id.*; ECF No. 204 at 6-7, Ex. A.) Although VMI has provided evidence that several of the VMI-serviced properties are in disrepair, they have not carried the burden of showing that their interests will be negatively impacted by the receivership process. Indeed, so far the process has worked to secure their interests while also protecting the interests of defrauded investors. Keeping the stay in place will preserve the status quo.

   **2.    Timing**

The stay was put in place on April 8, 2016. VMI argues that the Receiver has had ample time to restore title on the eight properties. The Receiver counters that he has a plan for restoring title on those properties. The SEC notes that the Receiver may require the assistance of the Court to compel non-compliant investors, who currently hold fractionalized interests of those properties, to relinquish those interests to the Receiver. In that capacity, on May 2, 2017, the Receiver filed a motion for an order appointing him as elisor for purposes of restoring real property interests to receivership entities, or, in the alternative, for an order to show cause regarding civil sanctions against the non-cooperating investors or in the alternative. (ECF No. 220.) The Receiver has therefore demonstrated that he is moving towards restoring title to the remaining properties.

As the Court held in *Wencke*, a court should consider how much time a receiver has had to review transactions and sort through the affairs when entertaining a motion to lift the stay. 622 F.2d at

1373-74 ("Where the motion for relief from the stay is made soon after the receiver has assumed control over the estate, the receiver's need to organize and understand the entities under his control may weigh more heavily than the merits of the party's claim. As the receivership progresses, however, it may become less plausible for the receiver to contend that he needs more time to explore the affairs of the entities."). However, the *Universal Financial* court noted that the question of timing is highly dependent on the facts of the case. In that case, the court upheld a stay that had been in place almost four years because there were remaining "factual and legal issues which still must be resolved in order to determine ownership of [the assets]." 760 F.2d at 1039.

In this case, the Receiver has working diligently toward marshaling the assets and maximizing the equity in the receivership. As in *Universal Financial*, there are remaining legal impediments to the Receiver's ability to market and sell several of the properties. Namely, the Receiver has not been able to secure title on thirteen properties (eight of which are serviced by VMI) due to the fact that several investors who hold fractionalized partial interests in the subject properties have not cooperated with the Receiver. The Court notes that the majority of the assets held by Defendants were real property, which can be particularly onerous to consolidate and liquidate. So far, the Receiver has received Court approval to sell twenty-nine residential properties in accordance with its Court-approved plan for marketing and selling the properties. The Receiver has not yet had sufficient time and opportunity to assume control over all of the real property assets in the receivership estate despite its diligent efforts.

**3. Merit**

The SEC points out in its opposition that VMI has not established that it would be able to foreclose on the eight properties without marketable title. (ECF No. 206 at 7-8.) The Receiver further notes that allowing foreclosure sales would incentivize the Receiver to sell the properties at "fire sale" prices to prevent the VMI-imposed deadlines from lapsing, thereby forcing the Receiver to surrender all of the available equity to VMI's lenders. This would result in one set of creditors (namely, VMI and the lenders) capturing all of the assets from the sale for themselves, to the detriment of the defrauded

9

investors and all other creditors. (ECF No. 204 at 12.) VMI does not address these arguments directly in its reply, but instead notes that recording notices of default "may very well motivate the remaining investors to execute the transfers sought by the Receiver rather than allow the properties to be foreclosed." (ECF No. 211 at 5.) VMI has not carried its burden of showing that it is entitled, or even able, to foreclose on the eight properties. Nor has VMI demonstrated that they are in danger of not being treated equitably in the process.

VMI's impatience with the process, and its desire to influence it, are understandable given its position as a secured creditor. However, the Court is inclined to continue to allow the Receiver to complete the complicated task of marshaling the assets and distributing them equitably in accordance with this Court's order. VMI has not carried its burden of showing that they are entitled to immediate relief from the foreclosure stay.

**C.** **<u>Instructions to the Receiver</u>**

With respect to the remaining properties that have marketable title and have not yet been sold, VMI asks the Court to instruct to the Receiver to: (1) provide rental rolls for all tenant-occupied properties on a monthly basis; (2) request that the tenants make the interiors of the properties available for photographs for inclusion in the multiple listing service ("MLS"); (3) request that tenants of listed properties make the interiors of listed properties available for inspection by potential buyers; (4) modify MLS listings to clarify that the seller will make necessary reasonable repairs to allow FHA financing; and (5) require the Receiver to obtain the approval of the Court before renewing any lease or rental agreement. (ECF No. 183-1 at 8.) VMI argues that these measures would allow the properties to be marketed and sold more effectively. (*Id.* at 7.)

As both parties acknowledge, a district court's power to supervise equity receiverships is broad. As the Ninth Circuit has explained:

> "[C]ase law involving district court administration of an equity
> receivership (once the receivership is underway) is sparse and is usually
> limited to the facts of the particular case. *See Lincoln Thrift*, 577 F.2d at

> 607 & n. 11, 608. Two basic principles emerge, however, from cases
> involving equitable receiverships, many of which involve SEC–initiated
> receiverships.
>   First, a district court's power to supervise an equity receivership
> and to determine the appropriate action to be taken in the administration of
> the receivership is extremely broad. . . . The basis for broad deference to
> the district court's supervisory role in equity receiverships arises out of the
> fact that most receiverships involve multiple parties and complex
> transactions.
>   Secondly, we have acknowledged that a primary purpose of equity
> receiverships is to promote orderly and efficient administration of the
> estate by the district court for the benefit of creditors. . . . Accordingly, we
> generally uphold reasonable procedures instituted by the district court that
> serve this purpose.

*SEC v. Hardy*, 803 F.2d 1034, 1037-38 (9th Cir. 1996) (citations omitted).

Given the substantial progress that the Receiver has made in restoring marketable title of the properties to the estate, and in marketing and selling the properties successfully, the Court is not inclined at this time to alter or otherwise micromanage the stipulated sales procedures. While the properties might not be marketed in the manner that VMI would prefer, the Receiver has made substantial progress given limited time and resources. As the Court noted in denying a different third party's motion to intervene in this case, the Receiver and the SEC adequately represent the creditors' interests, and creditors like VMI "may assert their claims in a summary claims process that provides adequate due process to the investors." *SEC v. BIC Real Estate Dev. Corp.*, No. 1:16-CV-344-LJO-JLT, 2017 WL 85789, at *4 (E.D. Cal. Jan. 10, 2017) (quoting *SEC v. TLC Invest. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001). Differences of opinion in how the receivership ought to be managed do not support intervention. *See United States v. City of Los Angeles, Cal.*, 288 F.3d 391, 402-03 (9th Cir. 2002) ("Any differences they have are merely differences in strategy, which are not enough to justify intervention as a matter of right.") (citation omitted); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996) (holding a difference in strategy is insufficient for intervention). Nor do they support VMI's motion for specific instructions to the Receiver. Having already approved suitable procedures for the disposition of real property held by the receivership, the Court is not inclined to micromanage the

Receiver's sales process at this stage. VMI's motion is therefore DENIED WITHOUT PREJUDICE to a renewed motion should conditions substantially change or progress toward sale of the remaining properties experience significant delays.

**D.     Attorney's Fees**

VMI moves for an award of $48,419.16 in attorney's fees incurred in its motion to intervene. VMI argues that under the Stipulation, it is entitled to seek attorney's fees prior to the final claims process and distribution of the receivership estate. (ECF No. 184-1.) The Receiver and the SEC argue that VMI is not entitled to an award of attorney's fees prior to the claims process under either the Stipulation or any other source of law and, in the alternative, that VMI is not entitled to attorney's fees at all for various reasons.

The Court has an obligation to ensure the equitable distribution of receivership assets. The Stipulation and Order provides a mechanism for funds to be set aside for VMI's attorney's fees, but does not set forth a time frame for the claims process. (ECF No. 154.) VMI is asking the Court to give special priority to its claim simply because it is not barred from doing so by its Stipulation with the Receiver and the SEC. However, VMI has offered no legal support for why it is entitled to attorney's fees before the Court has even considered distributing receivership assets to other creditors or investors. Indeed, in *Vescor Corp.*, the court recognized that secured creditors may be made to wait for payment until a receiver completes the claims process and recommends a distribution plan. 599 F.3d at 1195-96.

Reimbursing VMI, and only VMI, for its attorney's fees at this point would not comport with this Court's equity obligations. Nor does it promote judicial economy for the Court to consider VMI's rolling motions for compensation of attorney's fees during the pendency of the receivership estate. In short, the Court is unwilling to entertain an award of attorney's fees from the receivership estate prior to the conclusion of the sales process, consistent with the process in place for addressing all claims in the receivership. The Court makes no ruling or representation regarding the merits of VMI's motion for attorney's fees. VMI's motion for attorney's fees is DENIED WIHTOUT PREJUDICE, and VMI is

admonished that the Court will not entertain further motions of this kind until the receivership estate is settled.

## IV. CONCLUSION AND ORDER

For the reasons stated above, VMI's motions (ECF Nos. 183, 184) are DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

    Dated:   **June 7, 2017**              **/s/ Lawrence J. O'Neill**
                                                               UNITED STATES CHIEF DISTRICT JUDGE