UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BIC REAL ESTATE DEVELOPMENT CORPORATION and DANIEL R. NASE, individually and d/b/a BAKERSFIELD INVESTMENT CLUB,<br><br>Defendants,<br><br>BIC SOLO 401K TRUST and MARGARITA NASE,<br><br>Relief Defendants. | 1:16-cv-00344-LJO-JLT<br><br>MEMORANDUM DECISION AND ORDER RE: (1) OMNIBUS MOTION OF RECEIVER FOR ORDER: (1) APPROVING RECEIVER'S RECOMMENDED TREATMENT OF CLAIMS; AND (2) AUTHORIZING RECOMMENDED DISTRIBUTION ON ALLOWED CLAIMS (ECF NO. 393); (2) MOTION OF RECEIVER FOR ORDER INSTRUCTING VMI TO MAKE PAYMENT TO THE RECEIVER (ECF NO. 394); (3) VMI'S COUNTER-MOTION FOR ALLOWANCE AND PAYMENT OF ATTORNEY'S FEES (ECF NO. 398); (4) STATEMENT OF CAPITAL ONE BANK (USA), N.A. REGARDING STATUS OF FROZEN FUNDS IN RESPONSE TO COURT ORDER GRANTING PLAINTIFF'S MOTION FOR MONETARY RELIEF (ECF NO. 418); AND (5) SIXTH INTERIM REPORT AND PETITION FOR INSTRUCTIONS (ECF NO. 420) |

## I. INTRODUCTION

The Court has reviewed and considered the following motions and documents: (1) Omnibus Motion of Receiver, David P. Stapleton (the "Receiver"), For Order: (1) Approving Receiver's Recommended Treatment of Claims; and (2) Authorizing Recommended Distribution on Allowed Claims (ECF No. 393); (2) Motion of Receiver For Order Instructing Valley Mortgage Investments, Inc. ("VMI") To Make Payment to the Receiver (ECF No. 394); (3) VMI's Counter-Motion For Allowance

and Payment of Attorney's Fees; (4) Statement of Capital One Bank (USA), N.A. Regarding Status of Frozen Funds in Response to Court Order Granting Plaintiff's Motion for Monetary Relief (ECF No. 418); (5) Sixth Interim Report and Petition for Instructions of Receiver (ECF Nos. 420-21). The Court **ORDERS** as described below.

## II. BACKGROUND

The parties are familiar with the facts of this case. This Order concerns five different motions related to the distribution of funds by the Receiver.

First, on November 2, 2018, the Receiver filed an Omnibus Motion for an Order: (1) Approving Receiver's Recommended Treatment of Claims; and (2) Authorizing Recommended Distribution On Allowed Claims. ECF No. 393. The SEC filed a response on November 29, 2018. ECF No. 396. VMI filed an opposition on November 29, 2018. ECF No. 399. VMI filed a reply to the SEC's response on December 6, 2018. ECF No. 406.

Second, on November 2, 2018, the Receiver filed a Motion for an Order Instructing VMI to Make Payment to the Receiver. ECF Nos. 394-95. The SEC filed a response on November 29, 2018. ECF No. 397. VMI filed its opposition on November 29, 2018. ECF No. 400. VMI filed a reply to the SEC's response on December 6, 2018. ECF No. 405.

Third, on November 29, 2018, VMI filed a Counter-Motion for Allowance and Payment of Attorney's Fees. ECF No. 398. The SEC filed an opposition on December 6, 2018. ECF No. 403. VMI filed its reply to the SEC and Receiver's oppositions on December 12, 2018. ECF No. 407.

The Receiver filed a combined reply to VMI's oppositions and opposition to counter-motion for allowance and payment of attorney's fees. ECF No. 404.

Fourth, on December 5, 2018, Capital One filed a Statement regarding the status of frozen funds. ECF No. 327. Capital One filed a follow-up Statement on March 27, 2019. ECF No. 418.

Finally, the Court has also reviewed and considered the Receiver's Status Report and Sixth Interim Report and Petition for Instructions in making its decision. ECF Nos. 420-21.

Pursuant to Local Rule 230(g), the Court took the matters under submission on the papers. ECF No. 401.

### III. DISCUSSION

**A.     The Receiver's Request for Payment from VMI**

The Receiver requests that the Court order VMI to pay the Receiver $467,087.00 as reimbursement for administrative expenses incurred in connection with the management and maximization of value of the thirty-six (36) residential real properties which served as collateral for associated VMI hard-money loans. ECF No. 394-1 at 2.

"The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c).[1] This is also known as a "surcharge." "To recover expenses under section 506(c), the claimant must show that the incurred expenses were: 1) reasonable; 2) necessary; and 3) beneficial to a secured creditor." *In re Glasply Marine Indus., Inc.*, 971 F.2d 391, 393 (9th Cir. 1992). "Section 506(c) typically comes into play where the trustee stores or maintains the collateral pending liquidation or where a creditor's loan is secured by the debtor's inventory or equipment and the debtor-in-possession continues to operate its business during Chapter 11 proceedings." *In re Jenson*, 980 F.2d 1254, 1260 (9th Cir. 1992). "We measure the necessity and reasonableness of the Debtor's incurred expenses against the benefits obtained for the secured creditor and the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property." *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260 (9th Cir. 2000). To satisfy the "benefit" portion of the test, the Receiver "must establish in quantifiable terms that it expended funds directly to protect and

---

[1] The Court previously ordered the Receivership estate to be administered according to generally accepted principals of Bankruptcy, and thus cites to bankruptcy statutes and case law where appropriate in this Order. ECF No. 58 ¶ 4.

preserve the collateral. . . . [R]ecovery, however, is limited to the extent that the secured creditor benefited from the services." *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) (internal citations omitted); *see also In re River Processing, Inc.*, 145 F.3d 1340, *2 (9th Cir. 1998) ("The benefit to the holder of the security interest must be, clear, direct and quantifiable."). "Section 506(c) was not intended as a substitute for recovery of normal administrative expenses from the debtor's estate." *In re Jenson*, 980 F.2d at 1260.

Expenditure on property management likely was reasonable, necessary, and beneficial to VMI. However, as described below, the Court is presently unable to determine what funds are available in the Receivership to surcharge, as well as the extent to which the expenditure was reasonable, necessary, and beneficial to VMI, and did not constitute ordinary administrative expenses.

First, the plain language of § 506(c) states that the necessary costs and expenses may be recovered "from property securing an allowed secure claim." The Receiver cannot demand direct payment from VMI, but rather can only take the costs and expenses from the proceeds of property securing VMI's allowed secured claim. *See In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1067 (9th Cir. 2001) ("[A] § 506(c) surcharge is not an administrative claim, but an assessment against a secured party's collateral. . . . As such, it does not come out of the debtor's estate, but rather comes directly from the secured party's recovery. Consequently, § 506(c) expenses do not fall within the priority scheme of the Bankruptcy Code at all. These expenses are paid first out of the proceeds of the sale, before a secured creditor is paid.") (internal citations and quotation marks omitted); *In re Anderson*, 66 B.R. 97, 99 (B.A.P. 9th Cir. 1986) ("We read the Code to provide for the payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors."). The Receiver has sold thirty of the VMI properties and returned the remaining six to VMI and its lenders for foreclosure. On the Court's review of the record, it is unclear what funds collected as proceeds from sale of the 30 VMI properties remain in the Receivership. Presently, the only funds in the Receivership that arguably could be recovered "from VMI's propert[ies]" is $87,000 currently set aside pursuant to

the attorneys' fee stipulation. *See* ECF No. 154. But the Receiver requests over $400,000 as a surcharge. The Receiver must demonstrate that the amount of surcharge he seeks remains in the Receivership in the form of proceeds from the sales of VMI properties.

Second, as stated above, some amount of surcharge likely was reasonable, necessary, and beneficial to VMI. Managing and maintaining the properties was necessary in order to maximize their value to the Receivership, particularly given the undisputed disrepair and tenancy issues at some of the properties. *See In re N. Cty. Place, Ltd.*, 92 B.R. 437, 448 (Bankr. C.D. Cal. 1988) ("The completion of the construction and the leasing of the property was necessary to its ultimate sale, and to its administration by the trustee. The Court finds that [creditor] also could not have realized any value from this property without completing the construction and leasing of the buildings."). And the Receiver has established "in quantifiable terms that it expended funds directly to directly to protect and preserve" VMI's properties. Most of the Receiver's listed categories of expenses appear to serve to protect, preserve, or dispose of the properties. ECF No. 394-2 ¶ 6 (describing expenditures as related to "routine property management; maximizing tenancy rates; evicting problem tenants; undertaking necessary repairs and maintenance; paying taxes, utilities, insurance, homeowners association dues, and other fees; and cleaning and preparation for sale"); *but see In re Glasply Marine Indus., Inc.*, 971 F.2d at 394 ("The incidental benefits derived by Seafirst from paying property taxes do not trigger section 506(c)."). Moreover, VMI and its lenders benefitted from these services, as either VMI, its lenders, or a different third party would have been required to make these expenditures if the Receiver did not, otherwise risking diminution of the properties' values and thus potentially reducing VMI's ultimate recovery if expenditures for property management were not made. *See In re N. Cty. Place, Ltd.*, 92 B.R. at 446 ("If the trustee had not undertaken the leasing of the premises, [secured creditor] (or its successor) would have been required to lease the premises before income could be generated to service the debt and to realize the value of the property. The leasing of the property directly protected and preserved the property, and provided a specific benefit to [secured creditor].").

5

Nevertheless, the Receiver has not provided sufficient information and documentation for the Court to determine to what extent the property management expenditures were reasonable, necessary, and beneficial to VMI. Primarily, the Receiver does not establish the extent of the benefit that VMI received, as opposed to other creditors. Unless VMI is the sole creditor to receive a distribution of proceeds from sales of the VMI properties, every creditor will benefit to some extent from the property management expenditures, as the Receiver's declaration acknowledges. *See* ECF No. 394-2 ¶ 7 ("I determined that the expenditure of funds would ultimately inure to the benefit of the Receivership Entities and their creditors, including VMI."). The Receiver is only entitled to surcharge VMI's secured property to the extent VMI benefitted. *See* 11 U.S.C. § 506(c); *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d at 548. Such benefit must be proven with "specificity." *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1068. Moreover, the Court cannot determine the necessity and reasonableness of the expenses incurred based on the information provided by the Receiver. The Receiver's declaration lists the kinds of services he performed and provides a table summarizing the expenses. *See* ECF No. 394-2 at 3, 5. But the Receiver does not state what services were performed for a given property, much less how much was expended on each category of expense for each property. There is a wide range of total management fees incurred per property, ranging from $1,360 to $72,142. In addition, the Receiver provides minimal information about the benefits obtained for VMI and the amount VMI would have necessarily incurred through foreclosure and disposal of the property, which are what case law requires reasonableness and necessity to be measured against. *See In re Compton Impressions, Ltd.*, 217 F.3d at 1260.

Therefore, the Receiver's request for payment from VMI is **DENIED without prejudice**. The Receiver may renew his request for surcharge but must demonstrate what proceeds from the sale of each individual VMI property remain in the Receivership. The Receiver must further provide information that explains what kinds of specific services were performed for each property, and how much was expended for each service. The Receiver also must explain why VMI is to bear the entire cost of

6

administering the properties, or, alternatively, only seek to surcharge the properties to the extent VMI benefited. Finally, the Receiver must provide information to establish that the fees were necessary and reasonable.

B. **<u>VMI's Claim for Attorneys' Fees</u>**

VMI claims it is entitled to just over $110,000.00 in attorneys' fees. *See* ECF No. 398-1 at 10. As noted above, pursuant to the parties' stipulation, the Receiver is presently holding $87,000 in a separate account pending a determination by the Court regarding VMI's right to recover attorneys' fees. *See* ECF No. 154. "Where not authorized by statute, entitlement to attorney fees derives from the contractual terms chosen." *Chacker v. JPMorgan Chase Bank, N.A.*, 27 Cal. App. 5th 351, 357 (2018), as *modified on denial of reh'g* (Oct. 17, 2018), *review denied* (Dec. 12, 2018); *see also Boza v. U.S. Bank NA (Two Cases)*, 606 F. App'x 357, 359 (9th Cir. 2015) ("Where, as here, attorney fees are contractually provided for in the trust deed and promissory note, the beneficiary is entitled to recover attorney fees and costs incurred in order to enforce and protect his secured obligation.") (quoting *Wutzke v. Bill Reid Painting Serv., Inc.*, 151 Cal. App. 3d 36, 46 (1984)). The parties do not dispute that any attorneys' fees award hinges on interpreting the following language found in each of the deeds of trust for the thirty-six subject properties:

> 7. Protection of Lender's Security. If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which affects Lender's interest in the Property . . . then Lender, at Lender's option, may make such appearances, disburse such sums, including reasonable attorney's fees, and take such action as is necessary to protect Lender's interest. . . . Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon . . . shall become additional indebtedness of Borrower secured by this Deed of Trust.

ECF No. 398-2 ¶ 10 & Ex. B. The deed of trust's plain language provides that "reasonable" attorneys' fees "necessary to protect [VMI's] interest" become additional indebtedness on the original Deed of Trust debts.

However, each deed of trust only permits recovery of attorneys' fees expended as to that

individual deed of trust. The deeds of trust do not provide for pooling or splitting fees among different deeds if they are at issue in a single action, and VMI cites no law supporting its view that it may pool fees in the manner it proposes. The deeds of trust state that "amounts disbursed . . . pursuant to this paragraph . . . shall become additional indebtedness . . . . secured by *this Deed of trust*." ECF No. 398-2, Ex. B (emphasis added). The contracts' plain language only contemplates attorneys' fees being tacked on to the individual indebtedness of a given deed of trust. *See Chacker*, 27 Cal. App. 5th at 358 (collecting federal district court cases interpreting similar provisions as only allowing such fees to be added to the outstanding balance due under the promissory note, rather than authorizing an independent basis for an award of attorneys' fees, and holding the same); *Tyler v. Wells Fargo Bank, N.A.*, No. E063985, 2016 WL 3752394, at *4-8 (Cal. Ct. App. July 8, 2016) (unpublished) (same).

Therefore, the attorneys' fees must accrue to an individual property's indebtedness in order to establish a valid claim for the contractual fees to the receiver. VMI has not provided any breakdown attributing fees to the relevant property. The Court cannot order any fees be paid, until it receives a fee breakdown in the manner the deeds of trust require, *i.e.*, attributing fees incurred to the particular deed of trust the fees benefited. Moreover, to the extent VMI claims a given billing entry benefitted the properties equally, it must make that showing. And six properties have been released from the Receivership. ECF No. 398-1 at 3. While VMI states it was only able to recover attorneys' fees from two of the six properties at foreclosure, VMI still is not entitled to recover from the Receivership any further fees incurred for work performed relating to those six properties, because the fees accrued to those property's individual indebtedness. And there apparently are no proceeds available from the very first property sold by the Receiver, and thus VMI may not recover fees expended relating to that property. ECF No. 398-1 at 3. Additionally, the Receiver raises legitimate concerns regarding the necessity and reasonableness of the attorneys' fees incurred by VMI, and VMI's attribution will permit the Receiver to object properly to individual requests for fees, rather than make a blanket objection to the payment of all fees.

8

Finally, the Court notes that while it is permitting VMI to renew its attorneys' fee application, if there are insufficient funds to pay both the surcharge and attorneys' fees, the surcharge takes priority. *See In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1067 ("§ 506(c) expenses do not fall within the priority scheme of the Bankruptcy Code at all. These expenses are paid first out of the proceeds of the sale, before a secured creditor is paid.") (internal citations and quotation marks omitted).

Therefore, VMI's motion for attorneys' fees (ECF No. 398) is **DENIED without prejudice**. VMI may file a renewed motion for attorneys' fees that properly attributes fees incurred to individual deeds of trust and/or demonstrates that the fees incurred benefited each property equally.[2]

C. **Equitable Subordination of Attorneys' Fees Claims**

The Receiver and SEC argue that even if VMI is entitled to attorneys' fees, VMI's conduct justifies equitable subordination of its attorney fees claim. The equitable subordination of a claim requires three findings: "(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code." *In re First Alliance Mortgage Co.*, 471 F.3d 977, 1006 (9th Cir. 2006) (quoting *In re Lazar*, 83 F.3d 306, 309 (9th Cir. 1996)). "[E]quitable subordination is an unusual remedy which should be applied only in limited circumstances." *Lazar,* 83 F.3d at 309.

Additionally, "[w]here non-insider, non-fiduciary claims are involved . . . the level of pleading and proof is elevated: gross and egregious conduct will be required before a court will equitably subordinate a claim." *In re First Alliance Mortgage Co.*, 471 F.3d at 1006; *see also* 11 U.S.C. § 101(31)(A) ("The term 'insider' includes--if the debtor is an individual—(i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control;"),

---

[2] The bills submitted by VMI contain several redacted entries. To the extent VMI seeks these fees in its renewed motion, the entries must be provided to the Court unredacted, either under seal or for *in camera* review.

9

(B) ("if the debtor is a corporation--(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor").

There is no suggestion that VMI is a fiduciary or insider to the debtors, and therefore the Receiver must show that VMI's conduct was "gross and egregious." The Receiver and SEC argue "the manner in which VMI extended credit against the real properties securing its loans was wholly inconsistent with ordinary and responsible underwriting standard." *See* ECF No. 393-1 at 20. However, there is no evidence that VMI did anything unethical or illegal or otherwise inequitable in extending the credit. The Receiver and SEC mostly offer vague and conclusory assertions based on personal opinions, rather than specific facts or evidence. The closest the Receiver comes to demonstrating gross and egregious conduct is in his declaration, stating:

> Based on my experience as a receiver, including numerous matters involving loans secured by real property, such a rush [by VMI] to fund multiple loans reflects a substantial deviation from generally accepted underwriting standards, which call for a reasonable time to confirm all facts relating to prospective collateral, review attendant financial records, and consider any unique or unusual circumstances. In my opinion, had VMI adhered to ordinary underwriting standards, it should have been placed on at least constructive notice of Defendant Daniel Nase's misconduct.

ECF No. 393-2 ¶ 13. But this statement is insufficient to establish VMI's gross and egregious inequitable conduct. First, there are no specific facts or evidence presented demonstrating VMI in fact did not conform to underwriting standards, resulting in injury to creditors or conferring an unfair advantage to itself, much less evidence that VMI failed to conform to a gross and egregious extent. Second, without such evidence, it requires a further level of speculation to say that VMI should have been on constructive notice of Defendants' misconduct. Simply put, the Receiver and SEC do not provide any evidence that VMI engaged in gross and egregious conduct that injured other creditors or conferred an unfair advantage. *See In re Fitness Holdings Int'l, Inc.*, 529 F. App'x 871, 875 (9th Cir. 2013) (equitable subordination sufficiently pleaded where trustee alleged "insiders 'contrived' to benefit

themselves by knowingly funneling money to themselves out of a failing company"); *Sec. & Exch. Comm'n v. Total Wealth Mgmt., Inc.*, No. 15-CV-226-BAS-RNB, 2018 WL 3456007, at *10 (S.D. Cal. July 18, 2018) ("The Receiver's forensic accounting investigation and resulting findings satisfy the second equitable subordination requirement. After careful analysis of financial records, the Receiver has credibly proven that Cooper's misconduct conferred unfair advantage on Cooper to the detriment of the investor clients."). VMI's argument that it operated within the standards of its sector of the private mortgage market is plausible and not contradicted by any specific evidence.

Therefore, there is insufficient evidence of gross and egregious conduct, much less conduct that gave VMI an unfair advantage to the detriment of other creditors. Again, the Receiver raises legitimate concerns about the necessity and reasonableness of VMI's attorneys' fees incurred, particularly given VMI fully recovered on its underlying claims and no other claimant but VMI found such extensive legal intervention necessary in this case. But, even if other creditors may not be paid back in full, that appears to be a result of VMI's contractual and statutory rights, and its status as a secured creditor, rather than VMI's gross and egregious inequitable conduct. *See In re Universal Farming Indus.*, 873 F.2d 1334, 1337 (9th Cir. 1989) ("The risk that Spacek's claim may not be satisfied is not the result of the machinations of Thomen or Tabatabay, but follows inevitably from Spacek's status of junior creditor."); *In re First Alliance Mortgage Co.*, 471 F.3d at 1007 ("We agree with the district court that Lehman's activities were not carried out in contemplation of the later-filed First Alliance bankruptcy, and that Lehman's conduct was not a contributing factor to bringing about the bankruptcy or determining the ordering of creditors to the bankruptcy estate. Lehman did nothing to improve its status as a creditor at the expense of any other creditor. . . . The district court properly found that Lehman's conduct did not amount to the kind of fraud meant to be remedied by equitable subordination of bankruptcy claims."); *In re Paradigm Int'l, Inc.*, 635 F. App'x 355, 358 (9th Cir. 2015) ("BHC had the right to obtain payment under the Guaranty as a secured creditor, and there was no evidence of fraud or concealment."). Thus, the Receiver has not established equitable subordination of VMI's attorneys' fee claim is appropriate.

The Receiver's request for equitable subordination of VMI's attorneys' fees is **DENIED**.

D. **Frozen Capital One Funds**

On March 10, 2016, prior to the SEC's initiation of this action, Defendant Daniel Nase and now-dismissed Defendant Margarita Nase obtained personal lines of credit advance from their Capital One credit card accounts in the amounts of $43,962.29 and $50,000, respectively. ECF No. 48 at 2. On April 22, 2016, the Court granted Defendants' request that the aggregate amount of the Capital One credit line—$93,962.29—be deposited into the Vick Law Group (Defendants' counsel) client trust account and frozen. ECF No. 48 at 4. Claims against Margarita Nase were dismissed on March 22, 2017, with the stipulation noting "the Receiver has informed the SEC that it has recovered from Margarita Nase all funds and/or property in her possession, custody, or control which were traceable to the alleged fraud." ECF No. 179. In its May 4, 2017 order, the Court deferred decision as to whether the frozen Capital One funds could be used in satisfaction of Defendants' disgorgement obligations until it had all of the relevant information and had heard from the interested parties, including but not limited to Capital One. ECF No. 224 at 6. The SEC alerted non-party Capital One to the fact of the frozen proceeds. ECF No. 327 at 2. Capital One stated that Defendants have been in default on three Capital One credit card accounts since April 2016 and, as of September 2017, owed a total of $124,429.56 on the accounts. ECF No. 327 at 3. It is Capital One's position that the frozen Capital One funds should be released to Capital One. *Id.*

As far as the Court is aware, the Receiver has not taken any position on the frozen Capital One funds.[3] At a minimum, the Receiver's position on the Capital One funds is necessary to any determination as to their distribution. Therefore, the Court **ORDERS** the Receiver to provide its position as to the proper distribution of the Capital One funds within twenty-one (21) days of this Order.

---

[3] The Court has not received any objections or responses to Capital One's most recent request. The only parties who appear to have taken any position on the funds are the SEC, who argue the funds should be paid to the Receiver or, in the alternative, returned to Capital One, and Defendants, who contend Ms. Nase's Capital One funds are properly returned to her and Mr. Nase's Capital One funds should be used to pay his attorneys' fees. *See* ECF No. 224 at 5-6.

The Receiver **SHALL** provide a copy of this Order to Margarita Nase. Any other party believing it is entitled to the Capital One funds, including but not limited to Margarita Nase, may also submit an objection or response to Capital One's request within twenty-one (21) days of this Order. The Court further **ORDERS** the Capital One funds to remain frozen.

**E.       Receiver's Treatment of Remaining Claims**

No party has objected to the Receiver's proposed allowance and treatment of claims, aside from VMI regarding its attorneys' fees. However, as discussed above, the Court requires further information regarding the surcharge, VMI's right to recover attorneys' fees, and the frozen Capital One funds. Therefore, the Court **APPROVES** the Receiver's recommended treatment of all claims aside from VMI's attorneys' fees. The Court **DENIES AUTHORIZATION** to distribute funds for allowed claims, pending final decisions on the Receiver's surcharge, VMI's right to acquire attorneys' fees, and the distribution of the frozen Capital One funds.

## IV. CONCLUSION

For the reasons stated above, the Court orders as follows:

(1) The Receiver and VMI are **ORDERED** to meet and confer regarding potential settlement, given the Court's narrowing of the issues concerning the surcharge and attorneys' fees.

(2) The Omnibus Motion of the Receiver for Orders (1) Approving Receivers Recommended Treatment of Claims; and (2) Authorizing Recommended Distribution on Allowed Claims (ECF No. 393) is **GRANTED IN PART AND DENIED IN PART**. The Court **APPROVES** the Receiver's recommended treatment of claims, **EXCEPT** as to the treatment of VMI's attorneys' fees. The Court **DENIES AUTHORIZATION** for the Receiver to make any distributions on allowed claims, pending the resolution of the issues regarding the surcharge, VMI's attorneys' fees, and the frozen Capital One funds. Once the Court issues a final order regarding the surcharge, VMI's fees, and the Capital One funds, the Receiver may re-apply for authorization to distribute on allowed claims (as well as a revised treatment of claims, if necessary) in accordance with those future orders.

(3) The Receiver's Motion for Order Instructing VMI to Make Payment to The Receiver (ECF No. 394) is **DENIED without prejudice**. The Receiver may renew its motion in accordance with this Order within twenty-one (21) days of electronic service of this Order.

(4) VMI's Counter-Motion for Allowance and Payment of Attorneys' Fees (ECF No. 398) is **DENIED without prejudice**. VMI may renew its motion in accordance with this Order within twenty-one (21) days of electronic service of this Order.

(5) The Capital One funds are **ORDERED** to remain frozen, preserved in their entirety, and not drawn upon, pending further order from the Court. The Receiver is **ORDERED** to provide its position as to the proper distribution of the frozen Capital One funds within twenty-one (21) days of electronic service of this Order. Any other party believing it is entitled to the frozen Capital One funds also may object or respond within twenty-one (21) days of electronic service of this Order.

(6) The Receiver's Sixth Interim Report (ECF No. 420) is accepted. The Receiver is authorized to continue his administration of the Receivership Entities and their assets consistent with this Order and the Court's prior orders.[4]

IT IS SO ORDERED.

Dated: **May 16, 2019**            **/s/ Lawrence J. O'Neill**
                              UNITED STATES CHIEF DISTRICT JUDGE

---

[4] The Receiver's Sixth Interim Report also requests the Court "[a]ccept the Receiver's recommendations as presented herein." ECF No. 420 at 7. Based on the Court's review, the only recommendations not subject to prior Court orders relate to the surcharge and VMI attorneys' fees. This Order covers both of those issues. If there are other recommendations necessitating approval, the Receiver may renew his request but must provide more specificity regarding the exact recommendations.